**UNITED STATES of America,
Plaintiff,**

v.

State of NEW YORK, George E. Pataki, Governor of the State of New York, Brian J. Wing, Acting New York State Commissioner of Social Services, Barbara A. DeBuono, New York State Commissioner of Public Health, James L. Stone, New York State Commissioner of Mental Health, Thomas A. Maul, New York State Commissioner of Mental Retardation and Developmental Disabilities, Richard P. Mills, New York State Commissioner of Education, John L. Behan, Director of the New York State Division of Veterans Affairs, Walter G. Hoefer, Director of the New York State Office for the Aging, Jean Somers Miller, New York State Commissioner of Alcoholism and Substance Abuse, Alexander F. Treadwell, New York State Secretary of State, Robert R. Snashall,

Chairman of the New York State Workers' Compensation Board, Marva L. Hammons, Commissioner of Human Resources of the City of New York, and Thomas R. Wilkey, Executive Director of the New York State Board of Elections, in their official capacities, Defendants.

**Association of Community Organizations for Reform Now ("ACORN"), Plaintiff,**

v.

George E. Pataki, In his official capacity as Governor of the State of New York, Thomas R. Wilkey, In his official capacity as executive director of the New York State Board of Elections, Brian Wing, In his official capacity as Acting Commissioner of the New York State Department of Social Services, Barbara DeBuono, M.D., In Her Individual and Official Capacity as Commissioner of the New York State Department of Health, Marva Livingston Hammons, In Her Individual and Official Capacity as Commissioner of the New York City Department of Social Services and as Administrator of the New York City Human Resources Administration, Defendants.

No. 96–CV–5562(FB).

United States District Court,
E.D. New York.

March 26, 2003.

William R. Yeomans, Acting Assistant Attorney General for Civil Rights, by Joseph D. Rich, Rebecca J. Wertz, Richard Dellheim, Attorneys, Voting Section, Civil Rights Division, U.S. Department of Justice, Washington, DC, Roslynn R. Mauskopff, United States Attorney for the Eastern District of New York, by Sanford M. Cohen, Chief, Civil Rights Litigation, Marla Tepper, Assistant United States Attorney, Brooklyn, NY, for the Government.

Alexandra F. Mora, New Orleans, LA, for Association of Community Organizations for Reform Now.

Eliot Spitzer, Attorney General of the State of New York, by Victor Leong, Assistant Attorney General, New York, NY, for Defendants.

### MEMORANDUM & ORDER

BLOCK, District Judge.

Plaintiffs, the United States and the Association of Community Organizations for Reform Now ("ACORN"), brought this action challenging the voter registration system implemented by defendant State of New York through the defendant State agencies, each of which has been designated as a voting registration agency ("VRA") under the National Voter Registration Act of 1993 ("NVRA"). Settlements have been reached as to the majority of the defendant agencies, and litigation has resolved disputes as to others. *See United States v. New York*, 3 F.Supp.2d 298, 300–01 (E.D.N.Y.1998), *aff'd in part, rev'd in part, Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110 (2d Cir. 2000).

Defendants New York State Office of Temporary and Disability Assistance ("OTDA")[1] and New York State Office for the Aging ("SOFA") are the only State agencies with whom the plaintiffs have been unable to resolve their differences. These two agencies differ from the other defendant State agencies in that they ad-

---

1. OTDA formerly was known as the Department of Social Services ("DSS").

minister their services through district offices run by local municipal governments. The plaintiffs and these two defendants have each moved for partial summary judgment, asking the Court to declare whether OTDA and SOFA are responsible for ensuring that their local district offices comply with the requirements of the NVRA. The Court declares that they are.[2]

## BACKGROUND

### I

In a prior decision the Court held that the NVRA did not require the State to designate as VRAs New York City's public and private hospitals, nursing homes, clinics, and other community-based organizations that processed Medicaid applications. *See United States v. New York*, 3 F.Supp.2d at 298. On appeal, the Second Circuit affirmed, except with respect to State and local governmental offices that provide "public assistance" under the NVRA, as that phrase was interpreted by the Court of Appeals, thereby requiring such offices to be designated mandatory VRAs. *See Hammons*, 202 F.3d at 120–21. These prior decisions explained the statutory framework of the NVRA, which the Court briefly reviews.

In 1993, Congress enacted the NVRA to "establish procedures ... [to] increase the number of eligible citizens who register to vote in elections for Federal office" and to "enhance[ ] the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973 gg (b)(1), (2). The NVRA affords the states certain discretion in choosing offices within the state as VRAs, but mandates that:

Each State shall designate as [VRAs]—

(A) all offices in the State that provide public assistance; and

(B) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

§ 1973gg–5(a)(2); *see Hammons*, 202 F.3d at 114 (explaining nature of offices that *must* be designated under NVRA).

Once designated as a VRA, the office "must, in addition to the services they normally provide, furnish voter registration application forms to applicants, offer applicants assistance with the completion of those forms, and accept completed forms for transmittal to the appropriate State official." *Id.* at 115 (citing 1942 U.S.C. § 1973 gg–5 (a)(4)(A)). These offices must provide "the same degree of assistance with regard to the completion of [a voter] registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance." 42 U.S.C. § 1973 gg–5 (a)(6)(C). This process is known as "agency-based registration."

### II

In compliance with the dictates of the NVRA, in 1994 New York designated, by amendment to its Election Law, all of the defendant State agencies, including OTDA and SOFA, as mandatory VRAs. *See* 1994 Sess. Laws, c. 659, codified at N.Y. Elec. Law § 5–211. This statute, which tracks the requirements of the NVRA's agency-based registration requirements, provides that designated agencies

**2.** For the purpose of this decision, the Court need not decide whether OTDA and SOFA's district offices are in fact in compliance with NVRA. The parties have stated that a declaration on the discrete legal issue of whether, under NVRA, OTDA and SOFA are responsible for ensuring NVRA compliance by their local district offices would aid settlement discussions and likely serve a quietus to this entire litigation. *See* Oral Argument Tr. at 13 (March 6, 2002).

shall be required to offer voter registration forms to persons upon initial application for services, renewal or recertification for services and change of address relating to such services. Such agencies shall also be responsible for providing assistance to applicants in completing voter registration forms, receiving and transmitting the completed application form from all applicants who wish to have such form transmitted to the appropriate board of elections.

N.Y. Elec. Law § 5–211. Subsection 15 of § 5–211 requires designated agencies to take

all actions which are necessary and proper for the implementation of [the NVRA]. Each agency head shall designate one person within the agency as the agency voter registration coordinator who will, under the direction of the state board of elections, be responsible for the voter registration program in such agency.

N.Y. Elec. Law § 5–211(15). Pursuant to this subsection, OTDA and SOFA have designated individuals as their respective NVRA agency coordinators. *See* United States' Statement Pursuant to Local Rule 56.1 ("56.1") Ex. 16 (OTDA interrog. resp., at 15); 56.1, Ex. 22 (SOFA interrog. resp., at 13).

In 1995, the State Board of Elections ("SBOE") designated all of OTDA and SOFA's local district offices as VRAs. *See* Joint Stipulation of Facts (March 3, 1997), Ex. 13. In 1996, the SBOE adopted regulations implementing § 5–211, requiring designated sites to complete and send to the "appropriate board of elections" voter registration applications and a transmittal form quantifying the sites' NVRA transaction data. *See* 9 N.Y.C.R.R. § 6213.2(c)(1); *see also* N.Y. Elec. Law § 5–211(1) ("The [SBOE] shall adopt such rules and regulations as may be necessary

to carry out the requirements of this section...."). This data consists of the number of applications, declinations, requests for mail-in registrations, and blank forms received. *See* 56.1 Ex. 4 (SBOE Training and Reference Manual, at 4). The local boards of elections determine, *inter alia*, the number of new registrations resulting from the local sites' NVRA data, and forward this data and the new registrations to the SBOE. *Id.* at 19.

Although the SBOE collects the local district offices' NVRA data, the SBOE has stated that implementation and monitoring of local sites' compliance rests with State agencies, such as OTDA and SOFA:

Although the State Board of Elections is responsible for [NVRA] coordination and oversight, [NVRA] implementation and monitoring of participating site compliance rests with the 15 State agencies participating in the [NVRA] program. To assist agencies with this task, the [SBOE] provides statistical reports monthly to the NVRA program coordinators of each participating State agency. Data contained in the reports enables coordinators to review and analyze voter registration efforts at each participating site. *Follow-up efforts to ensure day-to-day compliance, if necessary, are performed by the designated agency coordinator.*

*See* 56.1 Ex.11 (SBOE 1997 Annual Report at 8) (emphasis added). The SBOE has also explained the role of the designated agency NVRA coordinator: "The agency [NVRA] coordinator is the person designated by a participating state agency to oversee implementation of [NVRA] in that agency." *Id.* at 9.

## A. OTDA

New York provides public assistance to needy persons under a variety of statutory programs, including, but not limited to

Family Assistance, Home Relief, Food Stamps, and Medicaid. OTDA is the State's principal agency for administering these programs.

OTDA has only two offices: one in Albany and one in New York City; it discharges its responsibilities through 58 local social service districts (district offices), established under the New York Social Services Law, which are administered by local governments. *See* N.Y. Soc. Serv. Law § 20(3)(a) (authorizing OTDA to administer services through local governments). However, the Commissioner of OTDA is responsible for "exercis[ing] general supervision over the work of all the local welfare authorities[.]" N.Y. Soc. Serv. Law § 34(3)(d); *see also* N.Y. Soc. Serv. Law § 17 ("The commissioner shall ... determine the policies and principles upon which public assistance, services and care shall be provided within the State both by the State itself and by the local governmental units[.]"); N.Y. Soc. Serv. Law § 20(3)(i) (OTDA is authorized "to assure conformance with federal law").

After the SBOE designated each OTDA local district office as a VRA, OTDA issued an Administrative Directive ("ADM") to the local district offices informing them of their obligations under the NVRA. *See* 56.1 Ex. 19. Beginning in May 1995, OTDA provided the district offices with DSS–2921 forms that incorporated a combined voter registration and declination form.

## B. SOFA

As required by the Federal Older Americans Act of 1965 ("OAA"), 42 U.S.C. § 3025(a)(1)(C), New York created SOFA to serve as the "single state agency" for "supervising" the State's administration of its plan for serving the elderly and "coordinat[ing]" State programs under the OAA. N.Y. Exec. Law § 536–a. Local governments seeking to operate a district office apply to SOFA.

SOFA has only one office, in Albany, from which it coordinates and supervises the administration of OAA services by 53 local district offices run either by county governments or the City of New York.

SOFA controls the district offices' provision of services in various ways. Federal law permits SOFA to withhold federal funds from district offices that fail to comply with federal or state law, agency regulations or policies. *See* 42 U.S.C. § 3026(e)(1). SOFA promulgates "Program Instructions," which are mandatory directives setting forth SOFA policies and regulatory information. District offices must enter into a Standard Assurances Agreement with SOFA which, together with a district office's Annual Implementation Plan, sets forth the district offices' obligations for receipt of federal and state funds distributed by SOFA. This Agreement acknowledges that all district office activities must "conform with all applicable Federal, State and Local Laws, and with ... [SOFA] Program Instructions[.]" 56.1 Ex. 25 (Standard Assurances Agreement at 1). SOFA has stated that, under the terms of the Standard Assurances Agreement, district offices must implement the NVRA. *See* 56.1 Ex. 41 (letters from SOFA to agencies referencing NVRA and Standard Assurances Agreement). Local district offices must comply with SOFA Program Instructions or face sanctions, including financial penalties or "de-designation" as SOFA district offices. *See* 9 N.Y.C.R.R. § 6652.1; 56.1 Ex. 29 (deposition of Robert Bush, Deputy Director of Finance and Administration for SOFA).

SOFA conducts annual on-site evaluations of each district office to determine compliance with SOFA standards, requires district offices to complete and submit SOFA self-evaluation forms, and requires

each district office to file quarterly reports with SOFA that detail the total number of persons served by each SOFA program. 56.1 Exs. 30 and 31 (SOFA evaluation forms)

During 1995 and 1996, SOFA issued at least six Program Instructions to district offices regarding NVRA implementation. In one of these Program Instructions, SOFA acknowledged that its "primary responsibility" regarding the NVRA included overseeing the district offices' "implementation of activities to comply with the [NVRA]." 56.1 Ex. 38 (SOFA Program Instruction, February 1995, at 2). Another SOFA Program Instruction informed the local district offices that NVRA compliance would be part of SOFA's annual review of each local district office. *See* 56.1 Ex. 40 (SOFA Program Instruction, February 1996, at 2). SOFA also admonished its district offices that "many" of them were "either not complying with [the NVRA] or are not reporting their statistics to the Board of Elections," and that NVRA implementation "must move ahead." 56.1 Ex. 39 (SOFA Program Instruction, July 1996). And after a review of data showed that none of the district offices had distributed voter registration forms to the public, SOFA issued a memorandum warning that "[f]ailure to participate in the National Voter Registration Act is a violation of both Federal and State law." 56.1 Ex. 45 (Kramer memorandum); *see* 56.1 Ex. 41 (Letter from Kramer to Director of Washington County Office, March 17, 1998, advising that Washington County Office was not in compliance with NVRA requirements).

### III

OTDA and SOFA raise a number of arguments in opposition to the plaintiffs' contention that they are responsible for ensuring that their local district offices comply with the NVRA:

1) The text of the NVRA does not explicitly require that state agencies such as OTDA and SOFA ensure NVRA compliance by district offices run by local governments.

2) If the plaintiffs believe that the local district offices are not in compliance, they should bring suit against those offices, and not OTDA and SOFA.

3) Construing the NVRA to require OTDA and SOFA to ensure NVRA compliance by the local district offices would be unduly financially burdensome for the State.

The Court concludes that these contentions are meritless.

### DISCUSSION

#### I

Plaintiffs seek relief pursuant to the declaratory judgment statute, 28 U.S.C. § 2201(a), which provides, in pertinent part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

42 U.S.C. § 1973 gg–9 (a) authorizes the Attorney General to bring suit in behalf of the United States to enforce the NVRA: "The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this subchapter." 42 U.S.C. § 1973 gg–9 (b) authorizes a private right of action for "a person who is aggrieved by a violation" of

the NVRA, which provides the authority for ACORN's suit.

■ Issuance of a declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir.1992); *see also Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 597 (2d Cir.1996); *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d 361, 366 (2d Cir.1993). The parties do not contend that there are material facts in dispute on the issue now before the Court, and acknowledge in their respective partial summary judgment motions that a declaratory judgment is the appropriate means for resolving this issue. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997) (same standard applicable on motion for summary judgment in declaratory judgment action as in any other action.)

**II**

■ OTDA and SOFA correctly state that the NVRA does not explicitly require that state agencies ensure NVRA compliance by county or city-run district offices. It matters not. It would be plainly unreasonable to permit a mandatorily designated State agency to shed its NVRA responsibilities because it has chosen to delegate the rendering of its services to local municipal agencies. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("We need not leave our common sense at the doorstep when we interpret a statute."); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 239, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) (Breyer, J., concurring) (avoiding interpreting Voting Rights Act "as containing a loophole that Congress could not have intended to create").

There are analogous federal judicial precedents. For example, in *Robertson v. Jackson*, the Fourth Circuit discussed, in the context of the Food Stamp Act, the principle that state agencies may not avoid their federal responsibilities through delegation:

A state that chooses to operate its program through local, semi-autonomous social service agencies cannot thereby diminish the obligation to which the state, as a state, has committed itself, namely compliance with federal requirements governing the provision of the food stamp benefits that are funded by the federal government.

972 F.2d 529, 533 (4th Cir.1992). The court concluded that the " 'ultimate responsibility' " for compliance with the federal program rested with the state, regardless of its delegation. *Id.*

Other courts have similarly held that federal duties placed upon state agencies are non-delegable. *See Woods v. United States*, 724 F.2d 1444, 1447 (9th Cir.1984) ("While the state may choose to delegate some administrative responsibilities, the ultimate responsibility for operation of the food stamp program remain[s] with the state."); *Reynolds v. Giuliani*, 118 F.Supp.2d 352, 385–86 (E.D.N.Y.2000) (concluding that state that chooses to delegate administration of Medicaid program to local agencies retains duty to ensure compliance with Medicaid Act's requirements); *Morel v. Giuliani*, 927 F.Supp. 622, 627 (E.D.N.Y.1995) (holding that State agency is obligated under Aid for Families with Dependent Children ("AFDC") and Food Stamp acts to supervise local agency and ensure its compliance "with applicable federal mandates"); *Moore v. Perales*, 692 F.Supp. 137, 139 (E.D.N.Y.1988) (holding that where New York had chosen to delegate administration of Food Stamp and AFDC acts to

local agencies, the "state ... is ultimately responsible for ensuring [that] compliance ... is accomplished through the local agencies."); *cf. Hillburn v. Maher*, 795 F.2d 252, 260 (2d Cir.1986) ("[T]he reason for the requirement that a state designate a 'single state agency' to administer its Medicaid program was to avoid a lack of accountability for the appropriate operation of the program.").

This principle of dominant state accountability is embraced by New York State judicial precedents as well. As expressed by the New York Court of Appeals, in holding the State DSS (now OTDA) accountable for attorneys fees for the misdeeds of New York City's DSS in wrongfully denying benefits under the AFDC program: "Local commissioners act on behalf of and as agents of the State ... [E]ach is a part of and the local arm of the single State administrative agency." *Thomasel v. Perales*, 78 N.Y.2d 561, 570, 578 N.Y.S.2d 110, 585 N.E.2d 359 (1991) (quotation marks omitted) (quoting *Beaudoin v. Toia*, 45 N.Y.2d 343, 346–47, 408 N.Y.S.2d 417, 380 N.E.2d 246 (1978)). Applying this principle in a comparable setting, the First Department in *Tormos v. Hammons*, 259 A.D.2d 434, 687 N.Y.S.2d 336 (1st Dep't 1999), noting that "State social services agencies have complete supervisory authority over the local departments," reasoned: "[S]ince the ultimate power and responsibility in this administrative scheme lies with State DSS, imposing responsibility ... on the State DSS takes this structure into account and avoids evasion of responsibility by bureaucratic fingerpointing and redtape shufflings." *Id.* at 436, 687 N.Y.S.2d 336 (quotation marks omitted) (quoting *Thomasel*, 78 N.Y.2d at 570, 578 N.Y.S.2d 110, 585 N.E.2d 359).

With regard to the NVRA, the principle of State agency supervisory responsibility and accountability is reflected in the State's legislative command that State designated VRAs, such as OTDA and SOFA, must take "all actions which are necessary and proper for the implementation of [the NVRA]," and the requirement in that regard that each State VRA designate a "voter registration coordinator" to be "responsible for the voter registration program in such agency." N.Y. Elec. Law § 5–211(15). As noted, OTDA and SOFA have indeed taken actions consistent with their responsibilities to ensure compliance by their local offices with the NVRA by the issuance of Administrative Directives (OTDA) and Program Instructions (SOFA). Moreover, as also noted, the SBOE has expressly recognized that "implementation and monitoring of participating site [NVRA] compliance rests with the ... state agencies .... [and] efforts to ensure day-to-day compliance [with NVRA], if necessary, are performed by the designated [State] agency coordinator." 56.1 Ex. 11 (SBOE 1997 Annual Report at 8).

Finally, as to the State's concern that requiring OTDA and SOFA to ensure NVRA compliance by their local agencies would be unduly financially burdensome, Congress contemplated the financial burdens of state agency-based NVRA enforcement. *See ACORN v. Edgar*, 56 F.3d 791, 796 (7th Cir.1995) ("Congress has passed a large number of laws altering state regulations of federal elections" which "evidently the costs of complying with ... have not imposed a significant fiscal burden on the states...."); *National Coalition for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F.Supp.2d 845, 855 (D.Md.2001) ("In passing the NVRA, Congress balanced the potential financial burdens facing states against the right of eligible ... voters to meaningful participation in the federal electoral process. The considerations favoring the enfranchisement of eligible fed-

eral voters prevailed."). On the other hand, the burdens that would be imposed upon the Attorney General and those persons seeking enforcement of the NVRA through the private right of action conferred by Congress, such as the plaintiff ACORN, would be palpable if they had to resort to litigation against multiple local agencies in lieu of holding State VRAs fully accountable for compliance with the NVRA.

## CONCLUSION

The Court grants the plaintiffs' motion for partial summary judgment and declares that OTDA and SOFA are responsible for ensuring compliance by their local district offices with the NVRA. In light of the parties' representation that the Court's declaration will likely lead to the full resolution of this extensive litigation, the Court will administratively close the case, subject to reopening if the parties do not reach their anticipated final settlement.

**SO ORDERED.**