ASSOCIATION OF COMMUNITY ORGA-
NIZATIONS FOR REFORM NOW
(ACORN), et al., Plaintiffs–Appellees,

v.

James R. EDGAR, in his official capacity
as Governor of the State of Illinois,
et al., Defendants–Appellants.

Nos. 95–1800, 95–1801, 95–
1802 and 95–1803.

United States Court of Appeals,
Seventh Circuit.

Argued May 8, 1995.

Decided June 5, 1995.

Judson H. Miner, Jeffrey Cummings, Barack H. Obama, Davis, Miner, Barnhill & Galland, Chicago, IL, for Association of Community Organizations for Reform Now (ACORN), et al., Plaintiffs–Appellees in No. 95–1800.

James R. Carroll, Roger Flahaven, Asst. Attys. Gen., Cara L. Smith, Office of the Atty. Gen., Civil Appeals Div., Tyrone C. Fahner, Lynne M. Raimondo (argued), Fredrick S. Levin, Richard E. Weber, II, Mayer, Brown & Platt, Chicago, IL, for Governor James R. Edgar, et al., defendants-appellants.

Jeanne M. Gills, David R. Melton, Keck, Mahin & Cate, Chicago, IL, for Chicago Coalition for the Homeless, et al., amicus curiae.

W. Mark Dunn, Office of the Atty. Gen., Richmond, VA, for Com. of VA, amicus curiae.

Thomas R. Meites, Joan H. Burger, Lynn S. Frackman, Paul W. Mollica (argued), Meites, Frackman, Mulder & Burger, Chicago, IL, for Catherine A. Calder, et al., plaintiffs-appellees in No. 95–1801.

Joan C. Laser, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Div., Chicago, IL, Steven H. Rosenbaum (argued), Samuel R. Bagenstos, Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, Thomas P. Walsh, Asst. U.S. Atty., Office of the U.S. Atty., Civil Div., Chicago, IL, Tricia A. Tingle, U.S. Dept. of Justice, Washington, DC, for the U.S., plaintiff-appellee in No. 95–1802.

Maria G. Valdez, Mexican American Legal Defense & Education Fund, Chicago, IL, Arthur Aram Baer (argued), Puerto Rican Legal Defense and Education Fund, Inc., New York City, for League of United Latin American Citizens, plaintiff-appellee in No. 95–1803.

Roger Flahaven, Asst. Atty. Gen., Cara L. Smith, Office of the Atty. Gen., Civil Appeals Div., Tyrone C. Fahner, Lynne M. Raimondo (argued), Fredrick S. Levin, Richard E. Weber, II, Mayer, Brown & Platt, Chicago, IL, for State of IL, et al., defendants-appellants in No. 95–1803.

Before POSNER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

POSNER, Chief Judge.

The National Voter Registration Act of 1993, 42 U.S.C. §§ 1973gg *et seq.*, popularly known as the "motor voter" law, is designed to make it easier to register to vote in federal elections. To achieve this end, the Act intrudes deeply into the operation of state

government. Among the provisions most disturbing to the State of Illinois—which has refused to comply with the law, thus precipitating these consolidated suits brought by the United States and others—is one requiring that every application for a license to drive contain information enabling it also to serve as an application to register to vote in federal elections; another requiring the state to create a mail-order form for registering to vote in such elections that does not require notarization; another that the state designate as agencies for the registration of federal voters all offices that dispense welfare and all state-funded programs primarily engaged in serving disabled persons; another that the state assist the clientele of these offices and programs in registering to vote in federal elections and assist "shut-ins" to register in their homes; another that the state may not strike people from the federal voter rolls merely because they have failed to vote; and another that erects procedural obstacles to striking from the rolls people who have moved from the address at which they were previously registered to vote. The "motor voter" law, Illinois argues, imposes without the state's consent new federal responsibilities that will require changes in state laws governing voter registration; imposes heavy unreimbursed costs on the state; and makes it more difficult for the state to fight vote fraud. Citing *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the state argues that Congress cannot force state governments to administer federal programs, here a program for facilitating the registration of voters in federal elections. The district judge disagreed, held the new law constitutional, and entered a sweeping injunction that we have stayed pending the state's appeal.

No other appellate cases examine the constitutionality of the "motor voter" law, and no previous federal election laws are sufficiently analogous to that law for decisions on their constitutionality to dictate the outcome of the present case. But the Constitution itself is clear enough to enable us to resolve the case with reasonable confidence even though we lack the usual crutches.

■ The first paragraph of Article I, section 4 provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." There is no reference to the election of the President, which is by the electoral college rather than by the voters at the general election; general elections for President were not contemplated in 1787. *Records of the Federal Convention,* reprinted in 3 *The Founders' Constitution* 536–38 (Philip B. Kurland & Ralph Lerner eds. 1987) (James Madison's notes of June 1–July 17). Nor (a point of greater potential significance to the constitutionality of the "motor voter" law) is there any reference to registration, which did not exist in the eighteenth century as a separate stage of the electoral process.

But these turn out not to be serious omissions so far as teasing out the modern meaning of Article I section 4 is concerned. Article II section 1 provides that "Congress may determine the Time of chusing the Electors [for President], and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." This provision has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections. *Burroughs v. United States,* 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934). And even in 1787 there was *functional* registration—just no registration *lists.* If someone showed up at the voting place who was not qualified to vote—not being a white adult propertied male—he would be turned away and so in effect denied registration, viewed functionally as the procedure for determining who is eligible to vote. Registration is indivisible from election. A state could not, by separating registration from voting, as most states do at present, be permitted to undermine the power that Article I section 4 grants to Congress.

Consistent with this point, the "Manner" of holding elections has been held to embrace the system for registering voters. *Smiley v.*

*Holm,* 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932); *Ex parte Siebold,* 100 U.S. 371, 25 L.Ed. 717 (1879); *United States v. Original Knights of the Ku Klux Klan,* 250 F.Supp. 330, 351–55 (E.D.La.1965) (three-judge court). For that matter, it has been held to extend to party primaries, *United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), any doubts that it reaches so far being dispelled by the necessary and proper clause of Article I section 8. Most of the regulations that have been promulgated under the authority of Article I section 4 are remote from the original rationale of the provision as stated by Hamilton in *Federalist No. 59*—that "every government ought to contain in itself the means of its own preservation." But laws frequently outrun their rationales. The provision is broadly worded and has been broadly interpreted. Nor is it certain that its rationale is as limited as Hamilton suggested. One of the unquestioned regulations enacted under the authority of Article I section 4 is the fixing of a uniform date for federal elections. 2 U.S.C. § 7. Such a regulation is not necessary to preserve the government of the United States or even to prevent an abuse of power by state governments. It is merely a sensible regulation of federal elections, and evidently Article I section 4 authorizes such regulations. The uniform date is authorized by the part of the section concerning the "Times" rather than the "Manner" of elections, but we cannot see what difference that makes.

As emphasized in *New York v. United States,* on which the State of Illinois relies so heavily, the provisions of the Constitution that relate to the states mostly tell them not what they must do but what they can or cannot do. Article I section 4 (not discussed in *New York v. United States* ) is an exception. The first sentence tells the states that they, not Congress, must regulate the times, places, and manner of holding federal elections, implicitly at their own expense. A state cannot say to Congress, "We are not interested in elections for federal office. If you want to conduct such elections in our state you must do so yourself—establish your own system of registration, hire your own registrars, find your own places for voting."

The state is obligated to do these things. *U.S. Term Limits, Inc. v. Thornton,* —— U.S. ——, ——, 115 S.Ct. 1842, 1854–55, 131 L.Ed.2d 881 (1995). The power conferred as a corollary to the imposition of this duty could be abused, so Article I section 4 goes on to provide that Congress can if it wants step in and either make its own regulations or alter those adopted by the state pursuant to the duty imposed by the first sentence. *Id.* at ——, 115 S.Ct. at 1857–59. Even when there is no abuse, as we have seen, Congress can, as in the law fixing a uniform date for federal elections, regulate federal elections *and* force the state to bear the expense of the regulation.

So Congress was given the whip hand. But this was subject in the first place to the reservation to the states of the power to fix the qualifications for voters for Senators and Representatives. Article I section 2 and the Seventeenth Amendment provide that the qualifications for voting for Representatives and for Senators, respectively, shall be those fixed by the states for electing the most numerous branch of the state legislature. The requirement that the qualifications be the same for state and federal electors, although primarily designed to prevent the disenfranchisement of state voters in federal elections, *Tashjian v. Republican Party,* 479 U.S. 208, 227–29, 107 S.Ct. 544, 555–57, 93 L.Ed.2d 514 (1986), also makes it difficult for a state to use its control over qualifications to frustrate the operation of Congress; it would be frustrating its own legislature's operations at the same time. The entire complex of provisions that we have quoted or summarized illustrates the intricate balancing or offsetting of governmental powers that is characteristic of the Constitution.

■ The "motor voter" law does not purport to alter the qualifications fixed by the State of Illinois for voters in elections for the Illinois Assembly. Indirect effects are possible: the law may, as the state argues, make it more difficult to enforce some of the qualifications, for example those relating to residency, by making it difficult to strike non-residents from the rolls. But the existence of such effects cannot by itself invalidate the law. Such effects are bound to follow from

any effort to make or alter state regulations of the times, places, and manner of conducting elections, including the registration phase. If Illinois could show that the law had been designed with devilish cunning to make it impossible for the state to enforce its voter qualifications, or that whatever the motives of the draftsmen the law would have that consequence, we might have a different case. The state has made neither showing.

■ Laying to one side, therefore, a possible conflict between Article I section 4 on the one hand and the Constitution's provisions regarding the qualifications of voters in federal elections on the other, we have a case in which Congress has exercised its power under the former provision to alter state regulation of federal elections. A state might already have had exactly the same provisions in its registration law (a law, let us say, equally applicable to state and federal elections) as are found in the "motor voter" law, and then that law would not alter state law. But if, as is true in Illinois, the state law regulating registration for federal elections differs from the "motor voter" law, the latter does alter state law. This seems, however, to be exactly what is contemplated by Article I section 4. The provision confers on Congress a "general supervisory power," *Ex parte Siebold, supra,* 100 U.S. at 387, under which it may "supplement ... state regulations or may substitute its own." *Smiley v. Holm, supra,* 285 U.S. at 366–67, 52 S.Ct. at 399. See also *Ex parte Yarbrough,* 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884).

Language is limited by context, so we do not place decisive weight on these general expressions. But the state itself concedes, as it must in light of the holding of *Ex parte Siebold,* that (setting aside the question of a possible infringement of the state's right to fix the qualifications of voters in federal elections) Congress could have established a separate system of voter registration for federal elections, manned by federal officers, having all the burdensome features of which Illinois complains. If Congress had done that, however, the burden would fall on the federal fisc alone. That is why the state is happy to make the concession. But Article I section 4 does not authorize Congress only to establish a system of federal voter registration. The first sentence, remember, requires the states to create and operate such a system and the second authorizes Congress to alter the state's system—but it is still the state's system, manned by state officers and hence paid for by the state.

*Buckley v. Valeo,* 424 U.S. 1, 132, 96 S.Ct. 612, 688, 46 L.Ed.2d 659 (1976) (per curiam), says that Article I section 4 must be fitted into the constitutional jigsaw puzzle and not allowed to obliterate the other pieces. As we are about to see, the provisions governing the qualifications of Senators and Representatives are not the only other pieces.

■ Any law that, like the "motor voter" law, tinkers with the ground rules for elections is worrisome. It creates a danger of entrenchment—a danger that a temporary majority may make the repeal of the law exceptionally difficult by altering the composition of the electorate in its favor. The state does not attack the "motor voter" law on that ground, however; nor do we suggest that such an attack would succeed. The state does argue, citing *Anderson v. United States,* 417 U.S. 211, 227, 94 S.Ct. 2253, 2263–64, 41 L.Ed.2d 20 (1974), and *Kasper v. Board of Election Commissioners,* 814 F.2d 332, 344 (7th Cir.1987), that the "motor voter" law opens the door to voter fraud so wide that the resulting dilution in the voting power of qualified voters infringes the right, held implicit in Article I section 2 (popular election of the House of Representatives), *United States v. Classic, supra,* 313 U.S. at 314–15, 61 S.Ct. at 1037–38; *Wesberry v. Sanders,* 376 U.S. 1, 16–17, 84 S.Ct. 526, 534–35, 11 L.Ed.2d 481 (1964), to vote in congressional elections. See also *Anderson v. Celebrezze,* 460 U.S. 780, 786 n. 7, 103 S.Ct. 1564, 1569 n. 7, 75 L.Ed.2d 547 (1983). But Illinois does not have standing to assert the voting rights of its citizens. Cf. *Massachusetts v. Mellon,* 262 U.S. 447, 485–86, 43 S.Ct. 597, 600–01, 67 L.Ed. 1078 (1923); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 3270 n. 16, 73 L.Ed.2d 995 (1982). Anyway the federal law contains a number of safeguards against vote fraud, see 42 U.S.C. §§ 1973gg–3(c)(2)(C), 4(c)(1), 5(a)(6)(A)(i), 6(b), 6(c)(2)(A), 7(b)(2),

10, and it is entirely conjectural that they are inferior to the protections that Illinois law offers.

■ The state gropes for some extratextual limitation on the power granted by Article I section 4—the sort of thing the Supreme Court used in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), to invalidate the Fair Labor Standards Act as applied to employees of state governments. The tool there was the notion that state sovereignty, an intrinsic feature of the constitutional scheme though nowhere expressly guaranteed (unless possibly in the Tenth Amendment), implied the power to fix the terms of employment of state employees. *National League of Cities* has been overruled, *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), and the Tenth Amendment (not even cited by Illinois) put back in its bottle. *New York v. United States, supra,* 505 U.S. at —— - ——, 112 S.Ct. at 2418–20; *U.S. Term Limits, Inc. v. Thornton, supra,* —— U.S. at —— - ——, 115 S.Ct. at 1854–57. But the basic principle relied on in *National League of Cities* survives, albeit in severely attenuated form, in cases such as *Gregory v. Ashcroft,* 501 U.S. 452, 461, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991), which hold that federal statutes are presumed not to regulate areas of traditional state prerogative. Application of the presumption has been wavering at best. William N. Eskridge, Jr. & Philip P. Frickey, *Cases and Materials on Legislation: Statutes and the Creation of Public Policy* 699 (2d ed.1995). But in *Gregory* the Court did use it to hold that the federal age discrimination law does not apply to state judges; and in this case Illinois advances the related notion that to make a state administer federal elections fatally compromises state sovereignty. That particular "fatal compromise," however, is built into the Constitution, precisely in Article I section 4, the first sentence of which places the burden of administering federal elections on the states.

We suppose, although it seems extraordinarily unlikely, that Congress might attempt to use the power granted in Article I section 4 to destroy state government, perhaps by constituting all employees of the state full-time federal voting registrars in order to make sure that every eligible federal voter in every state was registered. Maybe if Congress went *that* far it could no longer be thought to be merely altering the state's regulation of federal elections. *Buckley v. Valeo, supra,* 424 U.S. at 131–32, 96 S.Ct. at 688, does say, though in a very different context, that Congress's power under Article I section 4 is not infinitely ductile. But the present case has not been shown to be one in which the power exercised under that section has collided with state prerogatives somehow of constitutional dignity though nowhere expressly guaranteed in the Constitution. The State of Illinois has made no effort to quantify the cost that compliance with the "motor voter" law would impose on it, or to estimate even roughly what fraction of the state budget that cost would represent. Only a tiny handful of states have bothered like Illinois to challenge the law, even though it is widely believed to favor Democrats and the majority of state governors are Republicans. In the two centuries and more since Article I section 4 was ratified, Congress has passed a large number of laws altering state regulations of federal elections on the authority of that provision. See, e.g., 2 U.S.C. §§ 7, 9; 3 U.S.C. § 1. (We set to one side alterations based on the Civil War amendments, notably the Voting Rights Act, 42 U.S.C. § 1973.) No such laws apart from the "motor voter" law itself have, to our knowledge, been challenged judicially in recent times. Evidently the costs of complying with congressional alterations in the times, places, and manner of holding federal elections have not imposed a significant fiscal burden on the states, let alone the kind of staggering burden that might give color to Illinois' argument.

■ So much for the merits of Illinois' constitutional challenge to the "motor voter" law; what of the relief decreed? Until prompted at oral argument, the state had not challenged the form or details of the injunction. It had staked its all on persuading us that the law on which the injunction was based is unconstitutional. Ordinarily the failure to argue a ground for reversal is treated as a waiver that prevents the appel-

late court from relying on the ground to reverse the judgment appealed from. But there are exceptions, and two of them are in play here just as in *Hoover v. Wagner,* 47 F.3d 845, 850 (7th Cir.1995). When the ground involves the relation between governments, including the relation between the federal government and the states, the appellate court may invoke it on the court's own initiative. *Granberry v. Greer,* 481 U.S. 129, 134, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987); *Schlesinger v. Councilman,* 420 U.S. 738, 743, 95 S.Ct. 1300, 1305–06, 43 L.Ed.2d 591 (1975); *Younger v. Harris,* 401 U.S. 37, 40–41, 91 S.Ct. 746, 748–49, 27 L.Ed.2d 669 (1971); *Thomas v. Indiana,* 910 F.2d 1413, 1415–16 (7th Cir.1990); *Stone v. City & County of San Francisco,* 968 F.2d 850, 855–56 (9th Cir.1992). And likewise when the ground relates to the propriety or scope of an injunction. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312–13, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982); *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n,* 908 F.2d 144, 149 (7th Cir.1990); *Kasper v. Board of Election Commissioners, supra,* 814 F.2d at 338, 340. The misleading old saw that there is never a "right" to an injunction has this kernel of truth: because an injunction may harm third parties to the litigation and impose administrative burdens on the judicial system, a court asked to grant an injunction has the power to refuse even when both parties are pressing it to grant the injunction, as in the case, more dramatic than this, in which the injunction is contained in a proposed consent decree. *Hoover v. Wagner, supra,* 47 F.3d at 850; *Kasper v. Board of Election Commissioners, supra; Duran v. Elrod,* 760 F.2d 756, 759 (7th Cir.1985); *Angela R. v. Clinton,* 999 F.2d 320 (8th Cir. 1993).

 The decree made in this case declares that the State of Illinois is not complying with the "motor voter" law; declares that all provisions of Illinois law that conflict with the law are invalid; and enjoins the state officials who are the individual defendants, together with all persons acting in concert with them, from failing or refusing to comply with the law. So far, so good. But the court went on, in a fourth paragraph of the decree, to order the defendants to designate a chief state election official to be responsible for coordinating the state's responsibilities under the "motor voter" law; to delegate to that official "all necessary powers to achieve such compliance"; to take all necessary steps to enable people to register when they apply for a driver's license; to take all necessary steps to ensure that no one's registration to vote in federal elections is cancelled for failure to vote and that Illinois complies with the "motor voter" law before canceling any individual's registration to vote in federal elections unless the reason for cancellation is death, criminal conviction, mental incapacity, or the registrant's request; and to ensure that people who change residences within the same registrar's jurisdiction remain eligible to vote in federal elections even if they have failed to notify the registrar of the move before the election.

We do not understand the function of the additional requirements and prohibitions found in paragraph four. When asked about them at argument the federal government's able counsel did not defend them, even though the government had proposed them to the district court. Instead he suggested that a simple declaration of the constitutionality of the "motor voter" law and a simple injunction against violating it would have sufficed. Most of the additional requirements merely restate individual provisions of the law, such as the provision requiring the state to appoint an election "czar" to coordinate the state's responsibilities under the law. 42 U.S.C. § 1973gg–8. Since the simple injunction requires compliance with all provisions of the "motor voter" law, thus including the provision requiring the appointment of a state election "czar," we do not understand the purpose of repeating that provision in the injunction. It might seem harmless, if pointless, duplication, economy of expression not being high on the list of lawyers' virtues. It is pointless, but it is not harmless. There are differences in wording between the provisions of the law and the provisions of the judge's order, and, although it is unclear whether these differences are meant to have any significance, *any* verbal discrepancy in a legal instrument invites interpretive disputes. In at least one respect the court's order goes

well beyond the "motor voter" law. It requires the state to delegate to the election czar all necessary powers to ensure compliance with the law. The implication is that the state legislature must delegate legislative power to this official.

The "motor voter" law is an intrusion upon the operations of state government, the district court's decree an even greater intrusion. No justification for the additional intrusiveness appears in the court's opinion. The opinion does not discuss the decree. It merely announces it. The government, as we have said, does not defend the decree, though it is its own proposal that the court adopted.

We are forced to the conclusion that the Department of Justice, in proposing such a decree, and the district judge, in entering it, failed to exhibit an adequate sensitivity to the principle of federalism. The value of decentralized government is recognized more clearly today than it has been for decades. This recognition, born of experience, enables us (and not only us) to see that federal judicial decrees that bristle with interpretive difficulties and invite protracted federal judicial supervision of functions that the Constitution assigns to state and local government are to be reserved for extreme cases of demonstrated noncompliance with milder measures. They are last resorts, not first. *United States v. City of Chicago,* 870 F.2d 1256, 1259 (7th Cir.1989); *Kasper v. Board of Election Commissioners, supra,* 814 F.2d at 340; *Grimes v. Smith,* 776 F.2d 1359, 1367 (7th Cir.1985); *Duran v. Elrod, supra,* 760 F.2d at 759; *Angela R. v. Clinton, supra,* 999 F.2d at 325–26; *In re Pearson,* 990 F.2d 653, 658 (1st Cir.1993); *Mackin v. City of Boston,* 969 F.2d 1273, 1275–76 (1st Cir.1992); *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 959 (2d Cir.1983) (Friendly, J.); cf. *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 392–93, 112 S.Ct. 748, 764–65, 116 L.Ed.2d 867 (1992); *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 277 (7th Cir.1992). Since the State of Illinois, rather than seeking a declaratory judgment that the "motor voter" law is invalid, decided not to comply with the law, an injunction commanding compliance with it was a proper remedy, and of course a lawful one. *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985); *Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974); *Zych v. Wrecked Vessel Believed to Be the "Lady Elgin",* 960 F.2d 665, 669 (7th Cir. 1992). But until it appears that the state will not comply with such an injunction, there is no occasion for the entry of a complicated decree that treats the state as an outlaw and requires it to do even more than the "motor voter" law requires.

The fourth paragraph of the district court's decree is stricken. Should the state fail to comply with the decree, the federal government can seek supplementary relief, as well as institute proceedings for contempt. The decree, as modified, is affirmed, and the stay is dissolved.

Modified and Affirmed.