**CHARLES H. WESLEY EDUCATION FOUNDATION, INC., Jaru Ruley, George L. Shaw, Jr., Gerric Johnson, Marchaeus Bacon, and Earline J. Crawford, Plaintiffs,**

v.

**Cathy COX, Individually and in Her Official Capacity as Secretary of State of Georgia and Linda W. Beazley, Individually and in Her Official Capacity as Director of the Elections Division, Office of the Secretary of State of Georgia, Defendants.**

**Civil Action No. 1:04–CV–1780–WCO.**

United States District Court,
N.D. Georgia,
Atlanta Division.

July 1, 2004.

Bradley Erik Heard, Atlanta, GA, for plaintiff.

Penny Hannah, State of Georgia Law Department, Atlanta, GA, for defendant.

### ORDER

O'KELLEY, Senior District Judge.

The captioned case is before the court for consideration of plaintiffs' motion to substitute a party [2–1] and plaintiffs' motion for a preliminary injunction [4–1]. The Nu Mu Lambda Chapter of the Alpha Phi Alpha Fraternity, Inc. was originally named as a plaintiff, and the court orally **GRANTED** the motion to replace that organization with the current plaintiff Charles H. Wesley Education Foundation, Inc. ("the Wesley Foundation") at a hearing on June 29, 2004. The parties have briefed and orally argued the issues related to plaintiffs' request for a preliminary injunction.

### I. Background

There are relatively few pertinent facts in this case, and they are undisputed. The

Wesley Foundation is an organization designed to support and promote the charitable and educational endeavors of the Nu Mu Lambda Chapter of the Alpha Phi Alpha fraternity ("the fraternity"). [Am. Compl. at ¶ 11]. Plaintiffs Ruley, Shaw, Johnson, and Bacon ("the Wesley Foundation plaintiffs") are members of the fraternity and active participants in Wesley Foundation-sponsored programs. [Id. at ¶ 12]. Each year, the Wesley Foundation participates in a program developed by the fraternity called "A Voteless People is a Hopeless People." [Id at ¶ 14]. As part of that program, the Wesley Foundation has participated in numerous non-partisan voter registration drives primarily designed to increase the voting strength of African–Americans. [Id.]. Through these drives, the Wesley Foundation aims to provide a convenient way for a large number of people to register to vote. [Id. at ¶ 16]. Particularly for drives conducted in large metropolitan areas like Atlanta, the Wesley Foundation attempts to provide easy registration for potential voters who might be visiting the area from neighboring counties or states. [Id. at ¶ 18].

On June 12, 2004, the Wesley Foundation conducted a voter registration drive at the Mall at Stonecrest in DeKalb County, Georgia. [Id. at ¶ 26]. At that location, Wesley Foundation volunteers provided voter registration forms to those who wished to register. [Id. at ¶ 27]. The Wesley Foundation volunteers collected registration forms from people who resided in various Georgia counties and from out-of-state applicants. [Id. at ¶ 29]. Plaintiff Earline Crawford was one of those Georgia residents who gave her completed registration form to the Wesley

Foundation volunteers on June 12, 2004. [Id.].

At the conclusion of the registration drive, the Wesley Foundation volunteers collected each of the sixty-four [1] forms completed by Georgia residents and mailed them bundled in one package to the Georgia Secretary of State's office for processing. [Id. at ¶ 30]. The out-of-state application forms were sent to the appropriate out-of-state offices for processing. [Id.]. On June 17, 2004, a representative from the Georgia Secretary of State's office informed plaintiffs' counsel that the state was rejecting the bundle of applications because the Wesley Foundation had violated various provisions of Georgia law when it conducted the voter registration drive. [Id. at ¶ 32]. Specifically, the Secretary of State's office informed plaintiffs' counsel that, under Georgia law, only a registrar, deputy registrar, or an otherwise authorized person could accept or collect voter registration applications. [Id. at Ex. G]. Because no such person was present at the voter registration drive of June 12, the state refused to consider the applications contained in the package the Wesley Foundation sent to the Secretary of State. Plaintiffs seek to enjoin the state from refusing the applications and obtain an order from this court ordering the Secretary of State to process the applications such that those who are otherwise eligible may vote in the upcoming July 20, 2004 primary election, which will include candidates for federal office.

At the hearing on June 29, the parties were particularly helpful in agreeing to several facts that serve to significantly limit the scope of issues in dispute. The Secretary of State admits that the applica-

---

1. The amended complaint indicates there were sixty-three forms collected from Georgia residents. At the June 29 hearing, plaintiffs' counsel represented that the correct number was sixty-four. Either way, the precise number is not crucial to the outcome of the pending motion.

tions submitted on June 12, 2004 by the Wesley Foundation utilized an appropriate registration form and were timely for the purpose of ensuring that those who were eligible would be able to vote in the July 20 primary election. The Secretary of State further admitted that her office would have processed the forms if each registrant had mailed his application in a separate, postmarked envelope, which the Secretary of State contends is required by Georgia law for those who wish to register by mail. Accordingly, the only substantive issue presented to this court is the extent to which the Georgia Secretary of State must accept mailed applications from the organizers of a voter registration drive.

Plaintiffs contend the applications were sent to the Georgia Secretary of State in a manner consistent with the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. §§ 1973gg–1973gg–10. They assert that by refusing the applications sent on June 12, the state has violated their rights under the NVRA, the Voting Rights Act of 1965, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. They seek an injunction ordering the Secretary of State to process the forms submitted on June 12 and preventing her from similarly violating their above-referenced rights in the future. They also seek damages and attorney's fees. The Secretary of State contends that none of the plaintiffs has standing to bring this action and that her actions were consistent with state and federal law.

## II. Standing

Defendants contend that none of the plaintiffs has standing to bring this action. Each plaintiff will be addressed in turn.

### A. Earline J. Crawford

Plaintiff Crawford is alleged to have submitted a voter registration application to the Wesley Foundation volunteers at the June 12 drive that was among those rejected by the Secretary of State. The "case" or "controversy" mandate of Article III requires the following with regard to standing:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Defendants maintain that plaintiff Crawford fails on all three prongs of the standing analysis.

■ Defendants contend that Crawford is not injured because she is already a registered voter in the State of Georgia. At the June 29 hearing, plaintiffs' counsel advised that plaintiff Crawford had changed addresses within the state subsequent to her last registration. Per Georgia law, a registered voter must notify the state of a change of address so that his voting precinct and district can be updated. O.C.G.A. § 21–2–218. Those who change residences within Georgia and fail to notify the state of the new location must vote in their former precinct. O.C.G.A. § 21–2–218(d)–(e). Accordingly, to vote in the precinct of her new address, plaintiff Crawford had to notify the state of her new address. The court finds that plaintiff Crawford suffered a concrete and actual injury by the state's refusal to accept her registration containing her new address,

thereby preventing her from voting in her new precinct.

Defendants maintain that even if plaintiff Crawford were injured by the state's refusal to accept her application, the Secretary of State cured that injury by mailing her a new registration form, with filing instructions, on June 16, 2004. Given that the registration deadline for the July 20 primary was June 21, 2004, the court does not find that "remedy" sufficient. If the state improperly rejected her application, it cannot "cure" that action by mailing her a new form on the Wednesday before a Monday registration deadline.

■■■ Defendants next argue that plaintiff Crawford's injury is not traceable to the Secretary of State. Rather, they contend that the Wesley Foundation caused her injury by failing to conduct a voter registration drive within the boundaries of Georgia law. That argument, however, presupposes the answer to the very question that gives rise to this lawsuit: Do provisions of the Georgia Code violate federal law? If the court finds in the plaintiffs' favor on that question, then Crawford's injury will have been caused by defendants' failure to accept her application. Because the court can determine whether plaintiff Crawford's injury is traceable to defendants' actions only by determining the merits of the underlying question, it must at this stage find that she satisfies the "traceability" prong of the standing requirement. Finally, defendants contend that this court can provide plaintiff Crawford no relief because the June 21 registration deadline has passed. To the contrary, if the court finds that the state should have accepted her timely application received on June 14, it will simply order the defendants to treat her application as filed on that day. Accordingly, the court can redress plaintiff Crawford's injury, and she has satisfied all three prongs of the constitutional standing analysis.

Although not raised by any of the parties, the court notes that the question of standing is not limited to the constitutional requirements. There are additional prudential standing inquiries designed to determine "whether it is appropriate for this case to be litigated in a federal court by these parties at this time." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223 (11th Cir.2004). The Supreme Court has identified three prudential standing requirements. *Granite State Outdoor Adver., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir.2003). They include the general prohibition against a litigant raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in one of the other branches of government, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The court finds that none of the prudential standing concerns bars plaintiff Crawford's complaint.

**B. The Wesley Foundation**

■■ The test for determining whether an organization has standing to sue on its own behalf is the same as that which applies to an individual. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens Realty*, the Supreme Court considered whether an organization that operated a housing counseling service designed to combat racial discrimination had standing to sue under the Fair Housing Act of 1968. *Id.* at 366–68, 102 S.Ct. 1114. The Court found that the organization could satisfy the injury requirement by showing that its efforts to assist minorities in their search for housing had been frustrated by the defendants' racial steering practices. *Id.* at 379, 102 S.Ct. 1114. The Court was careful to note that the organization had to

show more than a mere "setback to [its] abstract social interests." Rather, the organization had to show an actual injury to its activities and the consequent drain on its resources caused by that injury. *Id.*

■ Here, the Wesley Foundation contends that the state's actions deprived it of the ability to conduct a voter registration drive as permitted under the NVRA. Specifically, it contends that under state law, the only way it could offer to forward completed applications to the Secretary of State would be by having a registrar or deputy registrar on hand at the drive to accept completed applications. That deputy registrar, who would be authorized to accept applications only from residents of the county in which the drive took place, would prevent the Wesley Foundation from accepting applications from out-of-county or out-of-state registrants, thereby limiting the scope and effectiveness of the program.

The court finds that the claimed injury directly affects the Wesley Foundation's ability to conduct the type of voter registration drive it attempted on June 12. Because it contends that its practice of submitting the application on behalf of the registrant is permissible under the NVRA, it has alleged an injury protected by the laws of the United States sufficient to satisfy the first prong of the standing analysis.

That holding is not contrary to the Fifth Circuit's decision in *Ass'n of Cmty. Orgs. for Reform Now v. Fowler,* 178 F.3d 350 (5th Cir.1999). In *Fowler,* the court held that the organization did not have standing to sue for several of its claims under the NVRA because it had not expended any resources specifically designed to counter-

act the state's allegedly unlawful practices. *Id.* at 359–60. The Fifth Circuit found that the organization did not have standing to challenge Louisiana's alleged failure to properly include voter registration applications with its drivers-license renewal packets or the state's alleged improper removal of certain names from the voting rolls. *Id.* The court found that although those actions might be contrary to the organization's interest in ensuring state compliance with the NVRA, the organization had suffered no direct injury. *Id.* The state's alleged failure to comply with those provisions of the NVRA had not caused the organization to expend resources. *Id.* Here, the Secretary of State's actions directly affect the activities the Wesley Foundation has pursued and wishes to pursue in the future. The Wesley Foundation has been rendered unable to collect and submit registration applications on behalf of those who attend its voter registration drives. That direct injury is more like the one the Supreme Court found sufficient to confer standing in *Havens Realty* than the one found deficient in *Fowler.*

The court finds the traceability and redressability prongs satisfied for reasons similar to those stated above addressing plaintiff Crawford. The injury is the direct result of the state's alleged failure to comply with federal law, and that injury can be redressed by an order from this court ordering the state to comply with the NVRA. Similarly, none of the prudential standing concerns apply to the Wesley Foundation. Accordingly, the court finds that the Wesley Foundation has standing to challenge the state's actions under the NVRA, which specifically provides for a private right of action.[2] 42 U.S.C.

---

2. Based on that finding, it is unnecessary to decide whether the Wesley Foundation also has standing to sue under the theory that its First Amendment rights were violated. Generally, a court should avoid a constitutional

question when the issue can be resolved on non-constitutional grounds. *See American Postal Workers Union, AFL–CIO v. U.S. Postal Service,* 764 F.2d 858, 861–62 (D.C.Cir.1985) (remanding to the district court for a determi-

§ 1973gg–9. For the same reasons, the court finds that the Wesley Foundation plaintiffs who wish to conduct the voter registration drives also have standing to sue under the NVRA.

## III. Preliminary Injunction

■ To be entitled to a preliminary injunction, the moving party must show the following: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc). An injunction is a drastic remedy that should not be imposed unless the moving party establishes each of the four prerequisites. *Id.*

### A. Likelihood of Success on the Merits

To determine whether plaintiffs have a substantial likelihood of success on the merits of their claims, the court must evaluate both the NVRA and the provisions of Georgia law plaintiffs assert are in conflict with the NVRA. Each will be addressed in turn.

### 1. The NVRA

In enacting the NVRA, Congress sought "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 42 U.S.C. § 1973gg(b)(1). To accomplish that goal, the act mandates that each state shall establish procedures to register to vote in federal elections (1) by application made simultaneously with an application for a motor vehicle driver's license; (2) by

mail application; and (3) by application in person. 42 U.S.C. § 1973gg–2. The most relevant portions of the law to the case at bar are those that provide the procedures to be used for application by mail and those that set forth the general requirements with respect to administering voter registration.

The section of the NVRA governing registration by mail provides that "[e]ach State *shall accept* and use the mail voter registration application form prescribed by the Federal Election Commission pursuant to section 1973gg–7(a)(2) of this title." 42 U.S.C. § 1973gg–4(a)(1) (emphasis added). Furthermore, each state may develop and accept its own form that meets the criteria established by the NVRA. 42 U.S.C. § 1973gg–4(a)(2). The law requires that either the NVRA form or the similar state form "shall be accepted and used for notification of a registrant's change of address." 42 U.S.C. § 1973gg–4(a)(3).

In addition to setting out the methods by which a state must offer and accept voter registration applications, the NVRA also establishes some general requirements with respect to the administration of voter registration. The relevant portions of that section of the NVRA provide as follows:

> In the administration of voter registration for elections for Federal office, each State shall-
>
> > (1) ensure that any eligible applicant is registered to vote in an election...
> >
> > (B) in the case of registration by mail under section 1973gg–4 of this title, if the valid voter registration form of the applicant is postmarked not later than the lesser of 30 days, or the period provided by State law,

nation of whether a restriction on an employee's right to participate in a voter registration

drive violated a statutory law before addressing the potential First Amendment violation).

before the date of the election; ... and

(D) in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official not later than the lesser of 30 days, or the period provided by State law, before the date of the election.

42 U.S.C. § 1973gg–6(a)(1)(B)–(D). Those courts that have considered the question have consistently found that the NVRA represents a valid exercise of Congress' power to regulate federal elections. *Ass'n of Cmty. Orgs. for Reform Now v. Miller,* 129 F.3d 833, 836–37 (6th Cir.1997); *Ass'n of Cmty. Orgs. for Reform Now v. Edgar,* 56 F.3d 791, 792–96 (7th Cir.1995); *Condon v. Reno,* 913 F.Supp. 946, 960–67 (D.S.C.1995).

### 2. Georgia Law

Georgia law permits voter registration by mail. O.C.G.A. § 21–2–223. That section of the Georgia code provides as follows: "The Secretary of State shall design, publish, and distribute voter registration application forms with which a person may apply to register to vote by completing and mailing the form to the Secretary of State." O.C.G.A. § 21–2–223(a). The Secretary of State interprets that section of Georgia law to mean that "a person" may register by sending one application in an individual envelope to the Secretary of State. [Aff. Of Kathy Rogers at ¶ 10]. The state contends that sending in a bundle of applications in one envelope is not permitted under § 21–2–223. Indeed, defendants' counsel conceded at the June 29 hearing that the Secretary of State would have accepted the applications from the Wesley Foundation's drive if each applicant had placed his or her form into an individual envelope and mailed that envelope to the Secretary of State.

In the letter the Secretary of State's office sent informing plaintiffs' counsel that it was rejecting the bundled applications, it indicated that it could not accept the package because "the Georgia Election Code does not allow for the acceptance or collection of voter registration applications by any person other than a registrar, a deputy registrar, or a person authorized to accept voter registration applications." [Mot. for Prelim. Inj. at Exh. G]. The Georgia Code places restrictions on "additional registration places" (which include voter registration drives) in that they may operate only during fixed hours and only if they have been advertised in the local media. O.C.G.A. § 21–2–215. The Rules and Regulations interpreting the Election Code specifically provide that a deputy registrar must be present at any "additional voter registration place." Ga. Comp. R. & Regs. r. 183–1–6–.03(3)(k)(1).

It is clear to the court that the state's policy prohibiting the acceptance of bundled applications and the policy requiring the presence of a deputy registrar at a voting drive are interrelated. The state asserts that it is unable to accept bundled applications precisely because they were collected by someone other than a deputy registrar. So, although the anti-bundling policy is allegedly supported by the provision of Georgia law permitting registration by mail only when the application is mailed by the registrant, it is also a result of the state's insistence that applications be collected by only a registrar or deputy registrar.

### 3. Is Georgia Law Consistent With Federal Law?

If Georgia law is inconsistent with the NVRA, the former must give way to the latter. *See Edgar,* 56 F.3d at 795. Writing for the court in *Edgar,* Judge Posner noted that to the extent that a state has a statutory provision regulating a subject covered by the NVRA, and to the extent

the state statute differs from the NVRA, the federal law must be read to alter the state statute. *Id.* Indeed, Congress explicitly noted that the states must follow the NVRA "notwithstanding any other Federal or State law." 42 U.S.C. § 1973gg–2(a).

■ Under the NVRA, Congress made it mandatory upon the states to accept voter registration applications by mail. 42 U.S.C. § 1973gg–4(a)(1) (noting that each state "*shall accept* and use the mail voter registration application") (emphasis added). In outlining the procedures for administering that requirement, Congress mandated that a state "*shall ensure* that any eligible applicant is registered to vote . . . if the valid voter registration form of the applicant is postmarked" by the appropriate date. 42 U.S.C. § 1973gg–6(a)(1)(B) (emphasis added). By making acceptance of the voter registration application mandatory when postmarked by the correct date, Congress simply did not allow the states to impose restrictions that would permit denial of an application that otherwise satisfies the federal requirements. Here, it is undisputed that each of the applications submitted by the Wesley Foundation arrived at the Secretary of State's office in an envelope postmarked by the appropriate date. That factual determination necessarily ends the legal analysis. Because the applications were received in accordance with the mandates of the NVRA, the State of Georgia was not free to reject them.

The state argues that under a "conservative" reading of § 1973gg–6(a)(1)(B), it would be permitted to reject those applications sent in a bundle. The court simply does not see how *any* interpretation of that section can avoid the plain conclusion that a timely, mailed, postmarked application must be accepted for processing.[3] Furthermore, the state argues that it should be permitted to avoid the plain language of the statute if it has a good policy reason for doing so. Again, the plain language itself dooms that argument. Had Congress meant to allow for exceptions, it would have so provided.

■ The court is not unsympathetic to the state's arguments concerning the policy rationales that underlie its position. The Secretary of State contends that requiring an individual applicant to mail his or her own form protects the privacy of the registrant and reduces the possibility of voter fraud. The court acknowledges that the state has a more onerous task in determining a registrant's qualifications to vote when the applicant may simply hand a registration form to a voter registration drive volunteer, who will in turn mail that form and many others to the Secretary of State. Nevertheless, although a provision of the NVRA may make the state's task of determining a voter's qualification to vote more burdensome, that is no defense to a charge that the state has failed to comply with the federal law. *Edgar*, 56 F.3d at 794–95. As noted by the *Edgar* court,

the law may, as the state argues, make it more difficult to enforce some of the qualifications, for example those relating to residency. . . . But the existence of such effects cannot by itself invalidate the law. Such effects are bound to follow from any effort to make or alter state regulations of the times, places, and manner of conducting elections, including the registration phase.

*Id.*

Nevertheless, even if the court is incorrect in holding that the state was not

---

**3.** It goes without saying that the statute, which requires acceptance "if the valid voter registration form of the applicant is postmarked" by the appropriate date, cannot literally mean that the postmark must be on the application. Paper mail is sent in envelopes, and it is the envelope that receives the postmark.

permitted to reject the applications based on the plain language of § 1973gg–6(a)(1)(B), the even broader language of § 1973gg–6(a)(1)(D) would have required the state to process the applications. In § 1973gg–6, Congress set out the procedures for accepting voter registration applications with a motor vehicle license application in subsection (1)(A), for applications received by mail in subsection (1)(B), and for applications received in person in subsection (1)(C). It then went on to further provide that a state "shall ensure that any eligible applicant is registered to vote in an election . . . in any other case, if the valid voter registration form of the applicant is received by the appropriate State election official" by the applicable date. 42 U.S.C. § 1973gg–6(a)(1)(D). That "catchall" provision forces the appropriate state official to accept a timely application no matter how it was received. By so regulating, Congress has effectively prevented the states from imposing restrictions on the manner in which applicants (or anyone else) may submit timely voter registration applications to appropriate state officials. Georgia's restrictions to the contrary must fail.

In conclusion, the court finds that the State of Georgia is not free to reject an otherwise timely mailed and properly postmarked application because it arrives in a bundle or because it was collected by someone other than a registrar or deputy registrar. Accordingly, the court finds that plaintiffs have a substantial likelihood of prevailing on the merits of their claim that the applications sent by the Wesley Foundation and received by the Georgia Secretary of State on June 14, 2004 were improperly rejected in violation of the NVRA.

### B. Irreparable Injury

The court easily concludes that plaintiffs will be irreparably injured absent an injunction. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir.1987). In the case of plaintiff Crawford, no monetary award can remedy the fact that she will not be permitted to vote in the precinct of her new residence. As for the Wesley Foundation and the Wesley Foundation plaintiffs, no monetary remedy can correct the fact that the applications submitted on June 12 were improperly rejected nor will a monetary remedy prevent the state from rejecting similar applications in the future. Accordingly, the court finds that plaintiffs have sufficiently shown that they will be irreparably injured absent an injunction.

### C. Harm to the Non–Movant

The third consideration involves the extent to which an injunction will harm the non-movant. The court finds that the threatened injury outweighs any harm that might befall the Secretary of State. If issued, the injunction would simply require the State of Georgia to process the sixty-four applications received on June 14 and any others received in a similar fashion in the future. The Secretary of State already has procedures in place for accepting applications sent through the mail; the only effect of this injunction might be to increase the quantity of those type of applications. The court finds that to the extent that such even constitutes a harm, it is a burden mandated upon the Georgia Secretary of State by the United States Congress, and one which she must accept. Furthermore, the court notes that it considered this motion for a preliminary injunction in a significantly expedited fashion so as to allow the state time to comply with any ordered injunctive relief. Defendants' counsel indicated to the court that if injunctive relief were to issue, it would have to be by July 1 to have effect for the July 20 primary. At the June 29 hearing,

defendants' counsel further indicated that the state would be able to comply even if injunctive relief were issued several days after July 1. Nevertheless, the court has complied with the original request for a ruling by July 1, thereby ensuring that the Secretary of State would be able to comply with whatever relief the court might order.

### D. The Public Interest

■■ Finally, the court easily concludes that an injunction would not be contrary to the public interest. The public has an interest in seeing that the State of Georgia complies with federal law, especially in the important area of voter registration. Ordering the state to comply with a valid federal statute is most assuredly in the public interest.

In conclusion, the court finds that plaintiffs have a substantial likelihood of success on their claims that the state's actions violate the NVRA, that plaintiffs will be irreparably injured absent an injunction, that the potential harm to the defendants is outweighed by the plaintiffs' injuries, and that an injunction is in the public interest. Accordingly, plaintiffs' motion for a preliminary injunction [4–1] is hereby **GRANTED.**

The defendants are hereby **ORDERED** to process the sixty-four applications received from the Wesley Foundation on June 14, 2004 to determine whether those registrants are qualified to vote. Those registrants should be notified of the qualification determination pursuant to O.C.G.A. § 21–2–226(d)–(e) in sufficient time such that, if eligible, they receive their voter card prior to the July 20 primary.

Furthermore, defendants are **ENJOINED** from rejecting any voter registration application on the grounds that it was mailed as part of a "bundle" or that it was collected by someone other than a registrar or deputy registrar or for any

other reason that is contrary to the provisions of the NVRA.

This injunction shall remain in effect until further order from this court.