UNITED STATES of America,
Plaintiff,

v.

The State of NEW YORK; The New York State Board of Elections; Stanley L. Zalen, Co–Executive Director of the New York State Board of Elections; The University of the State of New York; The New York State Education Department; Richard P. Mills, President of the University of the State of New York and Commissioner of the New York State Education Department; The State University of New York; and The City University of New York, Defendants.

No. 5:04–CV–00428(NAM/DEP).

United States District Court,
N.D. New York.

March 22, 2010.

Richard S. Hartunian, Esq., United States Attorney for the Northern District of New York, Paula Ryan Conan, Esq., Assistant U.S. Attorney, of Counsel, Syracuse, NY, R. Alexander Acosta, Assistant Attorney General, U.S. Department of Justice, Richard Dellheim, Esq., Ernest A. McFarland, Esq, of Counsel, Washington, DC, Andrew M. Cuomo, Attorney General of the State of New York, Charles J. Quackenbush, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge:

### I. INTRODUCTION

The United States has sued the State of New York, various appointed State officials, the New York State Board of Elections ("SBOE"), the University of the State of New York, the New York State Education Department ("NYSED"), the State University of New York ("SUNY") and the City University of New York ("CUNY") alleging violations of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C.1973gg *et seq.* The NVRA requires each state to "designate agencies for the registration of voters in elections for Federal office[,]" 42 U.S.C. § 1973gg–5(a)(1), and requires specifically

that "all offices in the state that provide State-funded programs primarily engaged in providing services to persons with disabilities" be so designated. 42 U.S.C. § 1973gg–5(a)(2)(B). Plaintiff alleges that defendants have violated and continue to violate NVRA by failing to designate disabled student services ("DSS") offices on the campuses of state-funded colleges and universities in addition to locally operated community colleges which are part of the SUNY and CUNY systems as mandatory voter registration offices within the meaning of 42 U.S.C. § 1973gg–5(a)(2)(B).[1] The complaint seeks declaratory and injunctive relief. Presently before the Court is the United States' motion for summary judgment. The State defendants oppose the requested relief.

## II. RELEVANT FACTS

The undisputed relevant facts before Court are as follows: SUNY has campuses across the State. While thirty-four campuses are fully State-operated, the other 30 are community colleges, sponsored by local governments (usually counties) under SUNY's general supervision. SUNY's State-operated campuses derive almost 40 percent of their income from direct State appropriations; the balance is from tuition and fees, Federal funds, and other sources. Community colleges that are part of the "SUNY system" are funded by sharing expenditures among the State, the local government sponsor, and tuition and fees. Under that system, they derive 30 to 40 percent of their operating income from direct State appropriations. Normally, State aid may not exceed about 40 percent

of operating income and tuition revenue may not exceed one-third of operating income; the local sponsor provides the remainder. Each community college has its own nine-member board of trustees. The local sponsor appoints five members and the Governor, four.

SUNY operates under rules and regulations promulgated by its Board. *See* N.Y. Educ. Law § 355. SUNY's Board of Trustees is responsible for supervising and coordinating "state-aided programs" in certain institutions providing higher education in New York; including community colleges which are part of the SUNY system. N.Y. Educ. Law §§ 355(b), 358. SUNY's Board is responsible for approving the establishment of community colleges, among others, in conformance with the master plan; the provision of standards and regulations covering the organization and operation of their programs, courses and curricula, financing arrangements, state financial assistance, tuition charges and fees, and such other matters as may be involved in the operation of such colleges. N.Y. Educ. Law § 355(c).

CUNY is located in New York City. CUNY has 13 senior colleges and six community colleges. *See* N.Y. Educ. Law § 6202; http://web.cuny.edu/about/cuny locationshoots/view-by-college.html (listing CUNY institutions). CUNY senior colleges include: Baruch College, Brooklyn College, The City College, Hunter College, John Jay College of Criminal Justice, Lehman College, Medgar Evers College, New York City College of Technology, Queens College, College of Staten Island, York College, The Graduate Center, CUNY

---

1. On or about the date that the United States filed the complaint in this action, counsel for the State defendants advised the Court that SUNY and CUNY had filed requests with the SBOE to voluntarily designate DSS offices on 34 SUNY and CUNY campuses (not including 30 county sponsored community colleges) as voter registration sites. The State defendants' counsel, however, emphasized that the voluntary designation of DSS offices as voter registration sites did not moot the substantive legal issue to be decided herein, that is, whether NVRA **mandates** that DSS offices must be so designated.

School of Law, The CUNY Graduate School of Journalism. *See* N.Y. Educ. Law § 6202. CUNY opened a new senior college, the "Graduate School of Journalism," in 2006. CUNY's six community colleges are: CUNY Borough of Manhattan Community College ("BMCC"), Bronx Community College, Hostos Community College, Kingsborough Community College, LaGuardia Community College, Queensborough Community College. N.Y. Educ. Law § 6202. CUNY's community colleges do not have separate boards of trustees. Nearly 60 percent of the funding of CUNY's senior colleges is provided by State appropriations; the balance is from tuition and fees and Federal and local funds. CUNY's community colleges are funded under the same system that applies to SUNY's community colleges. They derive almost 35 percent of their operating income from direct State appropriations.

Every SUNY state-operated university and college operates a DSS office. Every community college that is part of the SUNY system operates a DSS office. Every CUNY college operates a DSS office. There are over 100 DSS offices operated on CUNY and SUNY campuses. Many SUNY and CUNY universities and colleges design, publish, and distribute handbooks informing students about campus DSS office services and the procedures to be employed to obtain them. DSS offices at SUNY campuses seek to make SUNY activities and facilities "accessible to individuals with disabilities[.]" Each SUNY and CUNY DSS office is staffed with one or more employees to serve students with disabilities, including a disability coordinator. The term "disability coordinator" refers to the college employee who is primarily responsible for coordinating the disability services provided by the college, however named. The goal of providing disability services at SUNY and CUNY campuses is to make "higher education accessible to students with disabilities by removing architectural barriers and providing the programs and support services necessary for them to benefit from the instruction and resources of the University." Over 20,000 SUNY students are "individuals with some kind of disability." CUNY currently enrolls more than 8,000 students who identify themselves as having a disability. In the past decade, the number of students with disabilities attending CUNY has more than tripled.

DSS offices at SUNY's 34 State-operated campuses provide a range of services to students with disabilities including, but not limited to: information and referral, campus accessibility tours, personal orientation to campus, recruitment of aides, note takers, interpreters, readers, tapers, scholarship and award referrals, advocacy with campus and community agencies, accessible housing information, test taking accommodations, tutoring, training about disability and related issues, information about adaptive equipment, liaison with local, state and federal disability agencies, assistance with advisement and registration, personal and academic counseling, parking issues, peer counseling, employment assistance and a host of other individualized services, including alternative testing service programs (note-takers, assistive technology and adaptive equipment, extended exam time, private rooms, readers to dictate exams orally, scribes to record answers, and conversions of exams into large print or Braille). In addition, virtually all DSS offices provide educational counseling for students with disabilities.

The New York State Board of Elections's ("SBOE") Annual Report for 2006 states that pursuant to its NVRA agency-based registration program, SBOE has designated DSS offices at SUNY and CUNY campuses as among those "state agencies that provide programs primarily

engaged in providing services to people with disabilities." SBOE's Annual Report for 2006 states that in addition to the "programs and support services" offered students with disabilities by CUNY campuses, CUNY also provides "Special Programs for Students with disabilities or Individuals at CUNY" at certain campuses open to all CUNY students and/or the community at large. CUNY's "special programs" for students with disabilities include: Baruch College Computer Center for the Visually Impaired, Project Happy at Hunter College, Program for Deaf and Hard of Hearing Students at Hunter College, Program for Deaf Adults at LaGuardia Community College, Programs for Deaf and Hard of Hearing Students at New York City Technical College ("NYCTC"), Resource Center for Deaf and Hard of Hearing Students at the College of State Island, Queens College Homebound Program, The External Education Program for the Homebound at Queensborough Community College. CUNY also provides a Computer Assistive Technology Program to meet technology needs of students with disabilities at all CUNY colleges.

Each community college that is part of the SUNY system provides disability service "programs" to students with disabilities. In New York, "remediation programs" include programs providing services for students with disabilities.[2]

2. Among the disability-related statutes and administrative regulations in which New York State uses the term "programs" are: 14 N.Y.C.R.R. 51.2 (N.Y. State Department of Mental Hygiene regulations referring to DOH's "program of services for the mentally disabled"); 10 N.Y.C.R.R. 700.2 (N.Y. State Department of Health regulation defining "AIDS home care program" as a "coordinated plan of care and services"); 8 N.Y.C.R.R. 246.4 (N.Y. State Education Department regulation requiring applicants for constructing rehabilitation facilities to delineate "program of services" for persons with disabilities and the "the impact of the proposed construction upon those services"); 10 N.Y.C.R.R. 415.26 (N.Y. State Department of Health regulation requiring governing bodies of nursing homes to delineate the "program of services" provided to elderly residents); 14 N.Y.C.R.R. 51.2 (N.Y. State Department of Mental Hygiene regulation defining the establishment of a program of services for persons with mental disabilities); 14 N.Y.C.R.R. 72.3 (N.Y. State Department of Mental Hygiene regulation defining "clinic treatment program" as a "program of services" provided to persons with mental disabilities); id. (defining "day treatment program" as a "program of services" provided to persons with mental disabilities); id. ("night treatment program" as a "program of services" provided to persons with mental disabilities); 14 N.Y.C.R.R. 72.3 (N.Y. State Department of Mental Hygiene regulation defining "home care program" as a "program of direct services" provided to persons with mental disabilities); 14 N.Y.C.R.R. 72.3 (N.Y. State Department of Mental Hygiene Regulation defining outpatient facility or nonresidential facility as any place providing a "program of services" to persons with mental disabilities); 14 N.Y.C.R.R. 85.3 (N.Y. State Department of Mental Hygiene regulation defining "outpatient facility or nonresidential facility" as a place providing a "program of services" for persons with mental disabilities); 14 N.Y.C.R.R. 102.6 (N.Y. State Department of Mental Hygiene regulation requiring certain officials to have experience with "program[s] providing services" to certain persons with disabilities); 8 N.Y.C.R.R. 3.2 (N.Y. State Education Department regulation establishing committee to monitor "implementation of vocational rehabilitation and special education programs and services" for persons with disabilities); 8 N.Y.C.R.R. 155.12 (N.Y. State Education Department regulation referring to "special education programs and services" for students with disabilities); 8 N.Y.C.R.R. 200.1 (N.Y. State Education Department regulation referring repeatedly to "programs and services" available to students with disabilities); 8 N.Y.C.R.R. 200.2 (same); 8 N.Y.C.R.R. 200.3 (same); 8 N.Y.C.R.R. 200.4 (same); 8 N.Y.C.R.R. 200.5 (same); 8 N.Y.C.R.R. 200.6 (same); 8 N.Y.C.R.R. 200.8 (same); 8 N.Y.C.R.R. 200.9 (same); 8 N.Y.C.R.R. 200.13 (N.Y. State Education Department regulation requiring "continuum of special education programs and services ...

Congress has also used the term "pro- gram" in enacting disability-related stat- utes and administrative regulations.[3]

[to be provided] to students with autism); 8 N.Y.C.R.R. 200.14 (N.Y. State Education De- partment regulation requiring "programs and services" to students with disabilities enrolled in programs certified by the N.Y. State Office of Mental Health); 8 N.Y.C.R.R. 200.16 (N.Y. State Education Department regulation re- quiring "programs and services" to be provid- ed to preschool students with disabilities"); 8 N.Y.C.R.R. 200.20 (N.Y. State Education De- partment regulation requiring certain pre- school programs to have business plans re- garding "programs and services" for children with disabilities); 9 N.Y.C.R.R. 4.26 (Execu- tive Order declaring that the needs and con- cerns of persons with disabilities in New York State "must be considered as an integral part of the planning and implementation of all State programs and services affecting their lives and well being");10 N.Y.C.R.R. 709.3 (N.Y. State Department of Health regulation requiring evaluation of alternate "programs and services" available to students with dis- abilities to "substitute for or prevent the need for residential health care facility placement")

**3.** See, e.g., 29 U.S.C. 727(b)(1) (Commis- sioner's duties include "provid[ing] techni- cal assistance to programs ... regarding improving the quality of vocational rehabil- itation services"); 29 U.S.C. § 707 (relat- ing to fees for "services rendered by com- munity rehabilitation programs"); 29 U.S.C. § 711(a) (the Secretary must evalu- ate Rehabilitation Act programs' "structure and mechanisms for delivery of services"); 29 U.S.C. § 717 (imposing certain require- ments on "[a]ll programs ... that provide services to individuals with disabilities"); 29 U.S.C. § 720(a)(3)(G) (goals of a voca- tional rehabilitation program include "pro- viding vocational rehabilitation services" to students with disabilities); 29 U.S.C. § 721(a)(2)(A)(ii) (permitting agencies to "carry out a joint program to provide ser- vices to individuals with disabilities"); 29 U.S.C. § 721(a)(8)(A)(I) (requiring State plans for vocational rehabilitation services to assure that "prior to providing any vo- cational rehabilitation service ... the des- ignated State unit will determine whether comparable services and benefits are avail- able under any other program ...."); 29 U.S.C. § 721(a)(10)(E)(i)(V) and (VI) (re- quiring State agency implementing the program to submit reports including infor- mation regarding the "types of services, including assistive technology services and assistive technology devices, provided un- der the program" and "types of public or private programs and agencies that fur- nished services under the program"); 29 U.S.C. § 721(a) (24)(A) (authorizing State agency to contract with for-profit organiza- tions to provide vocational rehabilitation services and "related programs for individ- uals with disabilities"); 29 U.S.C. § 723(b)(2)(A) (authorizing "community re- habilitation programs" to "provide ser- vices" to benefit individuals with disabili- ties); 29 U.S.C. § 728a (permitting a State to expend funds "to inform employers of the existence of the program and the availability of the services of the pro- gram"); 29 U.S.C. § 762a(3) (requiring study of relationship between services pro- vided under Rehabilitation Act and pro- grams under the Social Security Act, among others, and requiring "recommen- dations to improve the coordination of ser- vices under the Rehabilitation Act of 1973" with programs of the Social Securi- ty Act); 29 U.S.C. § 771(a)(1) (authorizing grants and contracts to ensure training for "rehabilitation services to individuals with disabilities through vocational, medical, so- cial, and psychological rehabilitation pro- grams"); 29 U.S.C. § 771(a)(2) (authoriz- ing grants and contracts to "improve the provision of rehabilitation and other ser- vices including those services provided through community rehabilitation pro- grams"); 29 U.S.C. § 772(a)(1) (permitting grants to train personnel specifically to de- liver services in the client assistance pro- grams and "to deliver services, through supported employment programs, to indi- viduals with a most significant disability"); 29 U.S.C. § 772(f)(1) (when awarding grants for training interpreters, priority given to agencies or organizations "with existing programs that have a demonstrat- ed capacity for providing interpreter train- ing services"); 29 U.S.C. § 775(a)(4)(B) (referring to recreational programs as a "service program"); 29 U.S.C. § 773(b)(1) (permitting the Commissioner to provide grants "to pay for all or part of the cost of programs that expand and improve the

The State of New York provides funding to all 64 SUNY State-operated and community college campuses. *See* N.Y. Educ. Law §§ 352, 358, and 6304. The State of New York provides funding to all CUNY campuses. *See* N.Y. Educ. Law §§ 6221 and 6304. New York State law sets forth the funding mechanism for SUNY's State-operated campuses. *See* N.Y. Educ Law §§ 352, 358. Funds provided by New York State to SUNY State-operated campuses support the campuses' general operating budgets. *See* N.Y. Educ Law § 352. SUNY's Board of Trustees approves the general operating budgets of SUNY State-operated colleges. *See* N.Y. Educ. Law § 355(4)(a). SUNY's Board reviews and coordinates budgets and appropriation requests for all State-operated institutions. *See* N.Y. Educ. Law § 355(4)(a). The State Budget Director determines the amount of funds available to SUNY from the aggregate appropriations. *See* N.Y. Educ. Law § 355(4)(b). State law requires SUNY's Board to report annually to the State on issues such as operations, revenues, and expenditures. *See* N.Y. Educ. Law § 359(1). State law requires SUNY's Board to provide bi-monthly reports to the Chairs of the Senate Finance Committee

provision of rehabilitation and other services"); 29 U.S.C. § 791(c) (policies and procedures will be developed as to the "hiring, placement, and advancement in employment of individuals who have received rehabilitation services under State vocational rehabilitation programs, veterans' programs, or any other program for individuals with disabilities"); 29 U.S.C. § 796 (purports to promote a philosophy of independent living for individuals with disabilities by providing financial assistance to States to improve independent living rehabilitation service programs ... State vocational rehabilitation programs ... State programs of supported employment services ... client assistance programs ... programs funded under the Rehabilitation Act, programs funded under other Federal law, and programs funded through non-Federal sources); 29 U.S.C. § 796(c) (for a State to receive financial assistance under this statute, the State must submit a plan which includes a review period of the plan to ensure in part that certain needs will be appropriately addressed, such as the working relationships between "programs providing independent living services and independent living centers" and "the vocational rehabilitation program ... and other programs providing services for individuals with disabilities"); 34 C.F.R. § 363.1 (describing "state supported employment services program" as a program to assist States' provision of "programs of supported employment services for individuals with the most severe disabilities"); 34 C.F.R. § 361.1 (noting that State Vocational Rehabilitation Services Program is "designed to assess, plan, develop, and provide vocational rehabilitation services for individuals with disabilities ..."); 34 C.F.R. § 365.1 (State Independent Living Services program is funded to provide and enhance independent living services for individuals with significant disabilities as required by the Act); 34 C.F.R. § 369.1 (describing as "programs" the following: Vocational Rehabilitation Service Projects for American Indians with Disabilities, Special Projects and Demonstrations for Providing Vocational Rehabilitation Services to Individuals with Disabilities, Vocational Rehabilitation Services to Individuals with Disabilities, Vocational Rehabilitation Service Projects for Migratory Agricultural and Seasonal Farmworkers with Disabilities, Special Projects and Demonstrations for Providing Transitional Rehabilitation Services to Youths with Disabilities, Projects for Initiating Special Recreation Programs for Individuals with Disabilities); 34 C.F.R. § 363.1 (describing "State Supported Employment Services Program" as a program to assist States implementing "programs of supported employment services for individuals with the most severe disabilities"); 34 C.F.R. § 361.1 (State Vocational Rehabilitation Services Program is "designed to ... provide vocational rehabilitation services for individuals with disabilities ..."); 34 C.F.R. § 365.1 (State Independent Living Services program "[p]rovides to individuals with significant disabilities ... independent living services").

and the Assembly Ways and Means Committee and the State Director of the Budget regarding revenue and expenditures. *See* N.Y. Educ. Law § 359(2). State law requires SUNY's Board to submit an annual financial statement audited by an independent certified public accountant to the State Legislature, the Governor, and the State Comptroller. *See* N.Y. Educ. Law § 359(3). State law requires SUNY to provide quarterly breakdowns of all fund transfers between programs to the Chair of the State Senate Finance Committee, the State Assembly Ways and Means Committee, the State Comptroller, and the State Director of the Budget. *See* N.Y. Educ. Law § 355(4)(c)(7). The State Comptroller has review authority over SUNY's books and accounts. *See* N.Y. Educ. Law § 355(12). According to "The SUNY Compact: 2008–09 Budget Request" ("SUNY 2008–09 Budget Request"), for fiscal year 2007–08, State taxpayer support for SUNY State-operated campuses and University-wide programs equaled $1,172,254,000.

State law determines the manner that community colleges which are part of the SUNY system are funded. *See* N.Y. Educ. Law § 6304. State law requires the State to fund between 33 and 40% of a community college's operating budget. *See* N.Y. Educ. Law § 6304. Under State law, the remainder of community college budgets comes from local sponsorship and tuition. *See* N.Y. Educ. Law § 6304(1)(c) and (d). State law requires that master plans, standards, and regulations prescribed by SUNY's Board must include provisions for financing the operating costs of community colleges which are part of the SUNY system. *See* N.Y. Educ. Law § 6304. State law requires SUNY's Board to report annually to the Governor and Legislature regarding, among other things, any recommended changes in the community college financing formula. *See*

N.Y. Educ. Law § 6304(1)(b)(iii). Under State law, SUNY's Board is responsible for approving community college budgets. *See* N.Y. Educ. Law at § 6306(2); 8 N.Y.C.R.R. 600.2. Under State law, SUNY's Board is empowered to take "appropriate action relative to" community college budget requests. 8 N.Y.C.R.R. 602.3(c). SUNY's Board has, on occasion, rejected community college budgets. SUNY's Board may request periodic reports to ensure that community college plans are being implemented. *See* N.Y. Educ. Law § 6304(1)(a)(iv). SUNY's Board promulgates regulations governing the administration of community colleges, including schedules and formats for the preparation and submission of community college budgets to the SUNY Board. *See* N.Y. Educ. Law § 6304(1)(b)(iv).

Each community college that is part of the SUNY system must report to SUNY each year on all aspects of its budget, including "services" provided to "handicapped students." New York State and its agents promulgate directives applicable to, and binding on, community colleges that are part of the SUNY system regarding contributions to employee retirement programs. New York State and its agents promulgate directives applicable to, and binding on, community colleges regarding the procedures and format for reporting certain financial information. According to SUNY's 2008–09 Budget Request, for fiscal year 2007–08, State taxpayer support for community colleges that are part of the SUNY system equaled $444,284,000.

CUNY's Board of Trustees ("CUNY's Board") governs all of CUNY's "educational units," including its community colleges. N.Y. Educ. Law § 6204(1). CUNY's Board acts under the University's "general control." *Bd. of Higher Ed. of City of New York v. Cole*, 263 A.D. 777, 31 N.Y.S.2d 176, 177 (3d Dept.1941). Under

New York law, CUNY submits a long-range plan to the University every four years. *See* N.Y. Educ. Law § 6206(3)(a). The University (and the Governor) must approve CUNY's long-range plan, and once approved, that plan "guide[s] and determine[s] the development, organization and coordination of the city university." *See* N.Y. Educ. Law § 6206(3)(b). State law requires CUNY's Chancellor to propose an annual budget and, once approved by CUNY's Board, to submit that proposed budget to the Governor, the State Director of the Budget, the Senate Finance Committee, and the Assembly Ways and Means Committee. *See* N.Y. Educ. Law § 6230(2). No funds appropriated by the State may be spent until the State's Director of the Budget has presented the State Comptroller, the State Chair of the Senate Finance Committee, and the State Chair of the Assembly Ways and Means Committee with a certificate of aggregate funds available pursuant to State finance law. *See* N.Y. Educ. Law § 6221(A)(1). The State Director of the Budget may require CUNY senior colleges to conform to State statutory requirements, rules and administrative procedures regarding fiscal and budgetary matters. *See* N.Y. Educ. Law § 6221(A)(6).

In 1982, New York State assumed full financial responsibility for CUNY's senior college operations from New York City. Although New York City pre-finances CUNY's senior college operating costs, the State of New York reimburses the City of New York for 100% of the operating cost of the approved programs and services of CUNY senior colleges. According to "The City University of New York 2008–2009 State Adopted Budget", dated April 11, 2008, New York State taxpayer support in fiscal year 2007–08 for CUNY Senior College programs exceeded $1,000,000,000. In conjunction with the City of New York, the State also funds CUNY's community colleges. CUNY community colleges are funded from three sources: New York State, New York City, and tuition revenue. According to CUNY's 2008–2009 State Executive Budget and City Preliminary Budget Recommendations, in fiscal year 2007–08, New York State appropriated about $173,000,000 for CUNY community college programs and services. CUNY's community colleges derive almost 35 percent of their operating income from direct State appropriations. CUNY community college budgets must be approved by the State Budget Director. N.Y. Educ. Law §§ 6229(2), 6304(1)(b).

SUNY State-operated campuses' general operating budgets finance services provided by their DSS offices. In most cases, SUNY State-operated DSS office budgets are supplemented directly by money allocated by SUNY from funds controlled by SUNY.[4] DSS office services provided at

---

4. The United States cited voluminous evidence in support of its claim that SUNY State-operated DSS offices are supplemented directly by money allocated by SUNY: e.g., Correspondence from SUNY Albany DSS Director to SUNY General Counsel Office which indicates that both University of Albany DSS offices are funded primarily by State funds (Ex. 319);Document depicting State funding sources, including those from SUNY System Administration allocations for the Brockport College DSS Office (Ex. 191); Correspondence from Empire State College Assistant Vice President of Academic Affairs to SUNY General Counsel Office providing information about the allocation of funds for DSS office services, stating that college's "Disabilities Services [are] funded by SUNY" (Ex. 229); Correspondence from the College of Environmental Science and Forestry's Vice President to the SUNY General Counsel Office that states the "Funding for DSS services is primarily provided by SUNY...." (Ex. 233); Fredonia State College document listing DSS office general funding sources, including the SUNY System Administration (Ex. 249); Document depicting the sources, including annu-

SUNY State-operated campuses are funded predominantly with money appropriated by the State pursuant to a funding plan established by State law. See N.Y. Educ. Law § 352, 358. According to SUNY's 2008–09 Budget Request, New York State provided approximately $1.17 billion in adjusted State tax dollar support for SUNY's State-operated campuses and University-wide programs for the 2007–08 academic year.

Disability services offered at the community college campuses which are part of the SUNY system are funded in part by the State of New York. Most community college DSS budgets are funded solely from community college general operating budgets. The Office of Vocational and Educational Services for Individuals with Disabilities ("VESID"), located within the New York State Education Department, and the New York State Commission for the Blind and Visually Handicapped also provide direct funding for disability services programs at some community colleges that are part of the SUNY system.

Disability services offered at each CUNY college campus are funded wholly or in part by the State of New York. The

State of New York provides direct funding for all Services for Students with Disabilities at CUNY Senior Colleges. The State of New York provides direct funding for all services for students with disabilities at CUNY community colleges. For each fiscal year from 1998–99 through 2003–04, the State of New York provided $2,128,000 to fund CUNY Services for Students with Disabilities. CUNY Services for Students with Disabilities Budget Allocations. For each of fiscal year from 1998–99 through 2002–03, the City of New York provided $350,000 to fund CUNY Services for Students with Disabilities; for fiscal year 2003–04, the City of New York provided $575,500 to fund CUNY Services for Students with Disabilities. Funds used to establish and maintain DSS offices at all CUNY campuses are allocated from budgets that have been submitted to and approved by the University of the State of New York.

To receive services from SUNY State-operated DSS offices, students must apply for such services. To receive disability services offered by DSS offices at community colleges that are part of the SUNY system, students must apply for such ser-

al grants from the SUNY System Administration, for Geneseo College's ODS ("Office of Disability Services") for academic years 1998/1999 through 2003/2004 (Ex. 257); Morrisville State College email discussing state funding for DSS office from 2000–2004 (Ex. 266); Old Westbury College memorandum responding to request for production of documents by the United States ("U.S. RPD") (SUNY Central Administration is primary source of funding for DSS office) (Ex. 275); College at Oneonta Initial Allocations for Student Disability Services Accounts—FY99–/00–FY–03/04 chart (DSS office funded from a combination of college's general budget and SUNY System administration) (Ex. 282); Oswego College memo responding to U.S. RPD (DSS office funded through System Administration funds and state allocated funds) (Ex. 286); correspondence from SUNY to Oswego College President dated 12/2/1999,

9/25/00, 10/22/01, 7/30/02 granting funding for services for students with disabilities (Ex. 290); Plattsburgh College correspondences responding to U.S. RPD (DSS office funded from combination of college's general operating budget and federal funds) (Ex. 291); Potsdam College memorandum showing DSS office funded through a combination of funding from SUNY Administration, campus budget, and College Foundation funds (Ex. 297); Purchase College memo to SUNY responding to requested information for prior lawsuit (Source of DSS office from a combination of the college's general operating budget, System Administration, and at times VESID) (Ex. 301); Stony Brook University Funding Chart FY 1999/00–2004/05 (listing funding sources of disability services as from research overhead allocation, campus state allocation, and legislative allocation) (Ex. 309).

vices. Generally, students must apply in person for disability services and the DSS offices conduct in-person assessments to ensure the appropriate accommodation of individual needs. Students are generally required to submit a written application form to apply for disability services provided at SUNY and CUNY DSS offices. Applicants for disability services at all SUNY and CUNY campuses must provide written proof of one or more disabilities. Students applying for disability services are denied such services if they fail to meet the qualifying standards. Students who are denied DSS office services are offered an opportunity to appeal the denial of disability services.

Pursuant to its NVRA responsibilities, New York State has designated as voter registration agencies hundreds of county, municipal, and private offices throughout the State which may serve students or other citizens who are disabled.[5] However, the State of New York has not designated any DSS office at any public university, college campus or community college as a mandatory voter registration office. The United States filed the complaint in this case on April 15, 2004. Thereafter, New York State designated DSS offices at SUNY State-operated campuses and CUNY campuses as voluntary voter registration sites.

## III. PROCEDURAL BACKGROUND

This case was the subject of two previous memorandum-decisions and orders by this Court. In the first, the Court granted in part and denied in part, the State defendants' motion to dismiss the United States' complaint. Specifically, the Court dismissed the United States' claims against Eliot Spitzer, the former governor of the State of New York, and against the SUNY and CUNY chancellors originally named as defendants. The Court also denied, at the urging of the United States, the State defendants' motion to add New York's community colleges as indispensable parties on the ground that the record was not clear concerning the legal, financial and administrative relationship between the State of New York, SUNY and the various community colleges which are part of the SUNY system. The second memorandum-decision and order addressed the United States' appeal from an order of Magistrate Judge David E. Peebles denying the enforcement of document demands, interrogatories, and requests for admission served by the United States on the State defendants which required, in essence, that the State defendants obtain voluminous documents and information from the some thirty community colleges located throughout New York State. This Court affirmed Magistrate Judge Peebles' decision to deny the United States' request that the State defendants produce discovery related to the community colleges. The United States later obtained the desired discovery directly from the community colleges, however, by way of Fed.R.Civ.P. 45.

5. Offices designated by New York State as voter registration agencies include: the Salvation Army of Syracuse (Onondaga County), the YMCA of Greater New York (Kings County), Epilepsy Society, Inc. (Rockland County), Catholic Charities Housing Office (Albany County); Lennox Hill Neighborhood House (New York County), St. John's Episcopal Hospital (Queens County), Jewish Guild for the Blind (New York County), Mental Disabilities Law Clinic, Touro College (Suffolk County), Upstate Home for Children (Otsego County), El Puente de Williamsburg (Kings County), Albany County Mental Health Clinic (Albany County), Dutchess County Department of Mental Health (Dutchess County), Mohawk Valley Psychiatric Center (Oneida County), Catholic Charities of Rochester (Monroe County), Niagara County Office for the Aging (Niagara County), and L'Arche of Greater Syracuse (Onondaga County).

## IV. DISCUSSION

### A. *Absence of Case or Controversy*

█ The United States seeks relief pursuant to the declaratory judgment statute, 28 U.S.C. § 2201(a), which provides, in pertinent part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The State defendants oppose the United States' motion in the first instance on the ground that this Court lacks subject matter jurisdiction over this matter in the absence of evidence that an actual case or controversy exists. To wit, the State defendants assert that in spite of the United States' contention that New York has "deprived countless thousands of students with disabilities rights guaranteed by Congress," at no time has the United States presented evidence that any actual disabled student on any SUNY or CUNY campus or any campus of any community college been denied the opportunity to register to vote as allegedly required by the NVRA. The State defendants claim that this glaring deficiency is further amplified and exposed by way of the United States' previous arguments that no such proof is necessary.

The Court agrees that it need not find proof of cognizable harm to an individual to satisfy the case or controversy requirement for subject matter jurisdiction under

Article III, § 2 of the United States Constitution. It is true that the United States relies heavily on *National Coalition for Students with Disabilities Education and Legal Defense Fund ("NCSD") v. Allen*, 152 F.3d 283 (4th Cir.1998)[6] and *NCSD v. Scales*, 150 F.Supp.2d 845 (S.D.Md.2001), both of which involved fact-based controversies between persons allegedly denied rights or services secured under the NVRA. However, both of those actions were commenced by NCSD, an organization of private individuals working to encourage college students with disabilities to register to vote. Indeed, both actions involved persons "aggrieved by a violation" of the NVRA and authorized to commence suit pursuant to 42 U.S.C. § 1973gg–9(b).

█ In the instant case, the United States has filed this action to address New York's alleged non-compliance with the NVRA. The case or controversy here is not whether an individual has been deprived of rights secured by the NVRA, but rather, whether the State of New York has failed properly to implement the statute. Under 42 U.S.C. § 1973gg–9(a), the Attorney General "may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out" the requirements of the NVRA. While there may be no individual aggrieved by the actions or inactions of the State as set forth in the complaint, the NVRA provides broad authority to the United States in ensuring compliance with the provisions of the statute. Issuance of a declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to

**6.** *NCSD v. Allen* was later corrected in title only to read *NCSD v. Gilmore. See NCSD v.*

*Gilmore*, 190 F.3d 600, 601 (4th Cir.1998).

the proceeding." *Continental Cas. Co. v. Coastal Savings Bank,* 977 F.2d 734, 737 (2d Cir.1992); *see also Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 597 (2d Cir. 1996); *Texport Oil Co. v. M/V Amolyntos,* 11 F.3d 361, 366 (2d Cir.1993). Surely a declaratory judgment herein will be useful in resolving the impasse between the parties concerning the reach and scope of the NVRA and the State's right to manage its own affairs when it comes to registering voters.

Moreover, the State defendants cannot use their "ongoing efforts to interpret and effectuate the NVRA" as both a shield and a sword in this litigation. With one hand, defendants argue that though they have voluntarily designated DSOs as VRAs under the NVRA, they were not required to do pursuant to 42 U.S.C. § 1973gg–5. With the other hand, defendants insist that their ongoing efforts to effectuate Election Law 5–211 and the NVRA means the State should never have been sued in the first place. That the State has voluntarily or partially implemented the NVRA or is continuing in its effort to do so is not dispositive of the right of the Attorney General under 42 U.S.C. § 1973gg–9 to sue for enforcement or declaratory relief under the Act.

■■■ The State defendants maintain that, because they have performed the act of voluntary designation of the DSS offices as VRAs and are currently engaged in "ensuring compliance" with the law, that the United States has no basis for relief from this Court. This argument once again necessitates consideration of the doctrine of justiciability. As referenced above, Article III of the Constitution requires that this Court hear only live "cases" and "controversies." The Supreme Court has observed that it is oftentimes difficult to distinguish between what is an actual controversy and what is an attempt to obtain an advisory opinion on the basis of hypothetical controversies. With respect to a request for declaratory relief, in *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), Justice Brennan adopted the following test:

> The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

(quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). This test requires that a party seeking declaratory relief have "standing" and demonstrate that the controversy is "ripe" for adjudication. Even when these requirements are satisfied at the case's inception, a case may later be rendered moot by changed circumstances during the course of the litigation. When this occurs, justiciability is lost and the action is moot. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Similarly, a request for preliminary injunctive relief may become moot as a case proceeds. The burden of demonstrating mootness rests with the defendant. A case may become moot for one of two reasons: (1) the issues presented are no longer live, or (2) the party seeking relief lacks a cognizable interest in the outcome. *Powell v. McCormack,* 395 U.S. 486, 490, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

In *NCSD v. Taft*, 2002 WL 31409443, at *5 (S.D.Ohio Aug. 2, 2002), when faced with a nearly identical lawsuit by a voter advocacy group, the Ohio Secretary of State designated disabled student services offices at Ohio's state universities as VRAs under the NVRA in the wake of the plaintiffs' request for preliminary injunctive and declaratory relief. The court held that "[t]he fact that a defendant has voluntarily ceased the allegedly illegal conduct at issue does not necessarily render an action moot." *Id.* (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). "In order for the mootness doctrine to apply the defendant must demonstrate that there is no "reasonable expectation that the wrong will be repeated." " *Id.* (citation omitted). This burden rests with the defendant and it is a "heavy" one. *Id.* It must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 204, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). At the same time, however, it is the moving party's burden to demonstrate that injunctive relief is needed. In this case, the Court concludes that the controversy at issue is not moot.

In this case, while the that State defendants have taken steps to ensure voluntary compliance with the NVRA, they have not necessarily ceased the allegedly illegal conduct. Rather, the State defendants have persisted in their position that they need not comply with the NVRA because the statute applies only to those state offices engaged primarily engaged in the business of serving persons with disabilities and the primary purpose of state universities and colleges is to educate. The Court finds a live controversy at issue in this case because of the disagreement as to the applicability of the NVRA so as warrant consideration of the United United ed States' requests for declaratory and injunctive relief.

### B. Relevant Statutory Framework

#### 1. NVRA's Requirements as Applied to States

The NVRA, popularly known as the "motor voter" law, was designed to make it easier to register to vote in federal elections. To achieve this end, the Act "intrudes deeply into the operation of state government." *Assoc. of Cmty. Organizations for Reform Now ("ACORN") v. Edgar*, 56 F.3d 791 (7th Cir.1995).[7] As is the case with other arguably laudable measures enacted by Congress, many states viewed the NVRA as "failing 'to exhibit an adequate sensitivity to the principle of federalism.' " *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1416 (9th Cir.1995), *cert. denied*, 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 759 (1996) (quoting *ACORN v. Edgar*, 56 F.3d at 798). To wit, the Act

---

**7.** Among the provisions "most disturbing" to States such as Illinois—which initially refused to comply with the law was one requiring that every application for a license to drive contain information enabling it also to serve as an application to register to vote in federal elections; another requiring the state to create a mail-order form for registering to vote in such elections that does not require notarization; another that the state designate as agencies for the registration of federal voters all offices that dispense welfare and all state-funded programs primarily engaged in serving disabled persons; another that the state assist the clientele of these offices and programs in registering to vote in federal elections and assist "shut-ins" to register in their homes; another that the state may not strike people from the federal voter rolls merely because they have failed to vote; and another that erects procedural obstacles to striking from the rolls people who have moved from the address at which they were previously registered to vote. *ACORN v. Edgar*, 56 F.3d at 793.

forced state governments to administer a federal program for facilitating the registration of voters in federal elections. The "motor voter" law, some states argued, imposed without their consent: 1) new federal responsibilities requiring changes to state laws governing voter registration; and 2) heavy unreimbursed costs on the states. *See ACORN v. Edgar*, 56 F.3d at 793, *Voting Rights Coalition v. Wilson*, 60 F.3d at 1413–15, *ACORN v. Miller*, 129 F.3d 833, 835 (6th Cir.1997).

■ In each case, federal courts upheld the constitutionality of the NVRA and ordered state compliance with its express provisions. In rejecting the states' challenges to the validity of the NVRA, these Circuit courts focused on the authority Congress used in enacting the law in the first instance. Under the oft used power of the Commerce clause, Congress can enact laws which affect the States, but it cannot compel States legally to enact legislation implementing such laws. *See New York v. United States*, 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). However, Congress enacted the NVRA under the authority granted it in Article I, § 4 of the Constitution, which provides:

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law **make or alter** such Regulations, except as to the places of Chusing Senators.

(emphasis added).[8] Unlike the Commerce Clause at issue in *New York v. United States*, which enables Congress only to "make" laws affecting the states, Article I, § 4, by its express terms, grants Congress authority either to "make" laws regarding

federal elections, or to "alter" laws promulgated by states regarding federal elections. *See ACORN v. Miller*, 129 F.3d at 836. Moreover, as noted by the Sixth Circuit, the Constitution grants Congress explicit authority to force states to alter their regulation of federal elections and **does not** condition the authority on federal reimbursement. *See id.* at 837.

In the present case, the State defendants contend that a decree in favor of the plaintiff will effectively "nullify" all or a portion of the provision of New York Election Law that sought to implement the NVRA. This argument, though couched in indignity and crafted to highlight the blow to states' rights alleged to be at the heart of the complaint herein, fails to recognize that the proverbial ship on that issue has long sailed. Indeed, before this Court was ever called upon to examine the reach of the NVRA into the business of states registering voters, it was settled that § 4 of Article I of the Constitution, unlike the Commerce power in Article I, § 8, empowers Congress "to force states to alter their regulations regarding federal elections." *See id.* at 836.

2. Agency–Based Voter Registration under the NVRA

The NVRA establishes three separate procedures by which states must provide voter registration opportunities. First, the Act's so-called "motor voter" provision requires states to allow citizens to register to vote at the same time that they register for a driver's license. *See* 42 U.S.C. § 1973gg–3. Second, the NVRA mandates that states provide voter registration opportunities by mail. *See id.* at § 1973gg–4. Third, § 1973gg–5 of the Act requires

---

**8.** Article I, § 4 has been deemed to extend Congressional power in regulating presidential elections, *see Burroughs v. United States*, 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934), and party primaries involving federal congressional positions. *See United States v. Classic*, 313 U.S. 299, 317, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

states to make such opportunities available at certain state-designated office sites: a procedure also known as "agency-based" registration. The instant case centers on New York's implementation of the agency-based registration requirement of § 1973gg–5.

Under § 1973gg–5(a)(2):

Each State shall designate as voter registration agencies ["VRAs"]—

(A) all offices in the State that provide public assistance; and

(B) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

In establishing mandatory designations, Congress rejected a system that would "permit States to restrict their agency program and defeat a principal purpose of this Act-to increase the number of eligible citizens who register to vote." H.R. Conf. Rep. No. 103–66, at 19 (1993), reprinted in, 1993 U.S.C.C.A.N 105, 144. Additionally, Congress intended states "to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b)(2).

In addition to the "mandatory" VRAs of § 1973gg–5(a)(2), under § 1973gg–5(a)(3):

(A) ... [E]ach State shall designate other offices within the State as [VRAs].

(B) [VRAs] designated under subparagraph (A) may include(i) State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) [of § 1973gg–5(a)] that provide services to persons with disabilities ....

Thus, while a state must designate some offices as "discretionary" VRAs under § 1973gg–5(a)(3), the choice of which offices will be so designated is left to the state. *Disabled in Action of Metro. New York v. Hammons,* 202 F.3d 110, 115 (2d Cir.2000). Offices designated as mandatory or discretionary VRAs must, in addition to the services they normally provide, furnish voter registration application forms to applicants, offer applicants assistance with the completion of those forms, and accept completed forms for transmittal to the appropriate State election official. *See* 42 U.S.C. § 1973gg–5(a)(4)(A).

3. New York's Implementation of the NVRA's Agency–Based Voter Registration

In 1994, New York amended its Election Law to bring it into compliance with the requirements of the NVRA.1994 N.Y. Sess. Laws, ch. 659. Election Law § 5–211, as amended, designated the New York State Department of Social Services as a public assistance agency that was required to provide voter registration opportunities. The statute also required that all agencies of local government that furnished such assistance also provide for voter registration. The statute designated as mandatory VRAs the following state agencies that provide services to people with disabilities: (1) the Department of Health; (2) the Department of Labor; (3) the Office for the Aging; (4) the Division of Veterans' Affairs; (5) the Office of Mental Health; (6) the Office of Vocational and Educational Services for Individuals with Disabilities; (7) the Office of Mental Retardation and Developmental Disabilities; (8) the Commission for the Blind and Visually Handicapped; (9) the Office of Alcoholism and Substance Abuse Services; (10) the Office of the Advocate for the Disabled; and (11) all other offices which administered programs established or funded by such agen-

cies. The statute also designated as discretionary VRAs the Department of State and the Division of Workers' Compensation. As is relevant to the present litigation, § 5–211 required all institutions of SUNY and CUNY, at the beginning of each school year, and again in January of a year in which the president of the United States is to be elected, to "provide an application for registration [to vote] to each student in each such institution." N.Y. Elec. Law § 5–211.

## C. Plaintiff's Substantive Claims Under the NVRA

### 1. With Respect to SUNY and CUNY DSS Offices

■ The United States contends it is not sufficient that SUNY and CUNY institutions provide voter registration forms to their students pursuant to N.Y. Elec. Law § 5–211. The United States notes that NVRA "protections ... require not merely the presentation of a voter registration form, but also vital assistance in completing that form ... assistance needed by many persons with visual, motor and other disabilities." Moreover, the United States argues that unlike § 5–211, the NVRA "requires designated offices to transmit a completed voter registration form to the appropriate board of elections, thus relieving persons with disabilities of the burden of transporting the completed voter registration form to a post office or mail box, a substantial burden for persons with disabilities that Congress sought to eliminate." As a further matter, that the State of New York designated DSOs on most SUNY and CUNY campuses as discretionary VRAs under the NVRA following commencement of the present litigation is not, according to the United States, relevant to whether the State is required to designate these offices as mandatory VRAs under the federal statute. The United States

seeks an order declaring that the State defendants—by refusing to designate DSOs as mandatory VRAs under the NVRA—have failed to implement the requirements of 42 U.S.C. § 1973gg–5.

Having disposed of the State defendants' assertion that there is no case or controversy involved herein, the Court now turns their first alternative argument, that the NVRA left it up to states to identify and designate their own mandatory and discretionary VRAs. Indeed, not all state offices or agencies that provide services to persons with disabilities must be designated as mandatory VRAs under the NVRA. See 1973gg–5(a)(3)(B)(I) ("[discretionary] voter registration agencies ... may include ... offices not described in paragraph 2(B) that provide services to persons with disabilities.") Only those offices that "provide State-funded programs primarily engaged in providing services to persons with disabilities" must be designated as mandatory VRAs. The State defendants contend that SUNY and CUNY DSOs, though they are "offices" of public colleges, are not "primarily engaged in serving the disabled" within the meaning of the NVRA. This argument was rejected by the Fourth Circuit in NCSD v. Allen:

> We backtrack for a moment to the opening language of the NVRA, which makes its purpose clear: "to establish procedures that will increase the number of eligible citizens who register to vote." § 1973gg(b)(1). The centerpiece of the Act is the motor voter section, providing for the simultaneous application for a driver's license and voter registration. See id. § 1973gg–3. But Congress recognized that many citizens do not drive. To accommodate the non-drivers among us and to provide greater opportunity for registration in general, Congress requires states to designate a number of offices—offices that are not part of state

motor vehicle departments—as voter registration agencies. Nothing in the legislative history suggests that state college offices serving the disabled are not "offices" to be designated as voter registration agencies.

152 F.3d at 292. According to the legislative history of the NVRA, the "office" designation section of the Act is designed to "supplement the motor-voter provisions of the bill by reaching out to those citizens who are likely not to benefit from the State motor-voter application provisions." H.R.Rep. No. 103–9, at 12 (1993), reprinted in 1993 U.S.C.C.A.N. 105, 116. Offices serving the disabled and recipients of public assistance were identified as the offices "most likely to serve the person of voting age who may not have driver licenses." *Id.* By requiring states to designate these offices as voter registration agencies, "we will be assured that almost all of our citizens will come into contact with an office at which they may apply to register to vote with the same convenience as will be available to most other people under the motor voter program of this Act." H.R. Conf. Rep. No. 103–66, at 19 (1993), reprinted in 1993 U.S.C.C.A.N. 140, 144; *see also id.* ("If a State does not include … public assistance [offices and] agencies serving persons with disabilities … it will exclude a segment of its population from those for whom registration will be convenient and readily available—the poor and persons with disabilities who do not have driver's licenses and will not come into contact with the other principle [sic] place to register under this Act"). The Fourth Circuit found this legislative history persuasive on the point that "Congress did not in any way express an intent to exclude offices serving the disabled in public colleges from the term 'offices' in § 1973gg–5(a)(2)(B) of the NVRA." *NCSD v. Allen,* 152 F.3d at 292.

The State defendants claim that SUNY and CUNY campus DSOs are not simply serving disabled citizens as typical state-funded disability offices, but making programs of higher education accessible to disabled students. The Court deems this alleged qualification a distinction without a difference. It is undisputed that SUNY and CUNY universities and colleges are funded by direct State appropriations along with the DSS offices at these campuses. It is also undisputed that the DSS offices on SUNY and CUNY campuses offer a vast array of State-funded assistance and "programs" to disabled students, albeit in the context of their college or educational experience. Moreover, as referenced above, the NVRA has already been held validly to trample the very principles of federalism complained of by the State defendants herein. What's more, the Fourth Circuit's decision in *NCSD v. Allen,* which is virtually on point with the facts at bar, is nearly 12 years old. And in the wake of *NCSD v. Allen,* other federal district courts held that DSS offices at public universities must be designated as mandatory VRAs under the NVRA. *See NCSD v. Scales,* 150 F.Supp.2d 845 (D.Md. 2001) (DSS office at University of Maryland qualified as mandatory VRA under the NVRA after Fourth Circuit's determination in *NCSD v. Allen* ); *NCSD v. Taft,* 2002 WL 31409443 (S.D.Ohio Aug. 2, 2002) (various disability services offices at Ohio's public colleges are "offices" for purposes of § 1973gg–5(a)(2)(B) as they provide programs for the disabled, receive state funding and offer programs that are primarily directed to serve persons with disabilities). Because the State defendants cannot deny that the programs offered by the DSS offices on SUNY and CUNY campuses—which are State offices primarily serving disabled persons—are in large part State-funded, this Court is persuaded that the NVRA requires these offices be designated

as mandatory rather than discretionary VRAs.

2. With Respect to DSS Offices at Community Colleges

■ The Court next addresses the question whether the same conclusion rings true for DSS offices at community colleges which are part of the SUNY and CUNY systems. It is undisputed that according to the State defendants "the 'SUNY system' oversees educational services at locally sponsored community colleges in the course of its efforts to effectuate the New York State Board of Regents Statewide plan for Higher Education." While it is obvious from the vast record in this case that the Court could never determine the exact source or amount of financing of each DSS office at each community college, the undisputed facts demonstrate that the community colleges at issue herein are either under the control of CUNY, or part of the "SUNY system." Moreover, the State provides between 30–40% in direct operating funds for the community colleges that are part of the SUNY system. Thus, a significant portion of the community college budgets and thereby, the DSS budgets for the these campuses are funded directly by the State. The United States provided voluminous documentation in support of its claim that DSS offices at community colleges which are part of the SUNY system are funded by State money via various sources. Its is also undisputed that a percentage of the budget of DSS offices at CUNY community colleges are funded directly by New York State. The record further demonstrates that some community colleges which are part of the SUNY system receive additional State funding for disability services through State programs such as VESID. Thus, there seems no doubt that community college DSS offices are, like the SUNY and CUNY DSS offices, are

"offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" within the meaning of the NVRA. As such, the DSS offices at CUNY community colleges and at those community colleges which are part of the SUNY system must also be designated as VRAs under the NVRA.

The State defendants are aghast at the notion of saddling these entities with "liability" and a federal judgment when they have not been parties to the litigation, have not had the opportunity to defend their own interests and have not been heard in connection with the issues raised herein. Not unlike the various States, the Court notes that under the NVRA, the community colleges do not have their own interests. The NVRA is a federal mandate which states were forced to implement without regard to required costs or changes to their own election laws. The community colleges are no different than clerks offices, licencing offices, Department of Social Services Offices and other state and local government offices that have been required to implement the NVRA without ever having been a party to a lawsuit or had the opportunity to voice an objection.

In *United States v. New York*, 255 F.Supp.2d 73, 79 (E.D.N.Y.2003), two state agencies argued that the NVRA did not require the New York State Office of Temporary and Disability Assistance ("OTDA") and the New York State Office for the Aging ("SOFA"), which administered their services through district offices run by local municipal governments, to ensure NVRA compliance. Indeed, the state argued that if the United States believed—as does the United States in the present case—that these local district offices were not in compliance with the NVRA, they should bring suit against these offices just

as the State believes the community colleges should have been sued as necessary parties in this case. While the Eastern District noted that the NVRA did not "explicitly require" that state agencies ensure NVRA compliance by county or city-run district offices, the court held "[i]t matters not." 255 F.Supp.2d at 79. To wit, the court held it would be "plainly unreasonable to permit a mandatorily designated State agency to shed its NVRA responsibilities because it has chosen to delegate the rendering of its services to local municipal agencies." *Id.* According to the Eastern District, "there are analogous federal judicial precedents" for holding that state agencies may not avoid their federal responsibilities through delegation. For example, in *Robertson v. Jackson,* the Fourth Circuit discussed, in the context of the Food Stamp Act, the principle that:

> A state that chooses to operate its program through local, semi-autonomous social service agencies cannot thereby diminish the obligation to which the state, as a state, has committed itself, namely compliance with federal requirements governing the provision of the food stamp benefits that are funded by the federal government.

972 F.2d 529, 533 (4th Cir.1992). The court concluded that the " 'ultimate responsibility' " for compliance with the federal program rested with the state, regardless of its delegation. *Id.*

The State defendants argue that, unlike the state agencies in *United States v. State of New York,* they have not delegated the provision of state services to local offices because each locally sponsored community college in New York State has its own proprietary business existence, its own Board of trustees and its own managerial authority. The State defendants argue that in *United States v. New York,* it was clear that the state agencies had dele-

gated the provision of state services to local offices whereas here no such delegation has occurred. The State defendants' contentions are belied by common sense and the record before the Court. The community colleges are part of the "SUNY system," and that the "SUNY system" oversees educational services at locally sponsored colleges "in the course of its efforts to effectuate the New York State Board of Regent's Statewide Plan for Higher Education." The inclusion of the community colleges in the "SUNY system's" statewide plan for higher education coupled with the undisputed direct State financing of the community colleges leads this Court to conclude that the State has indeed delegated State services—the provision of higher education services—to community colleges that are part of the SUNY system. Thus, *United States v. New York* is an apt precedent.

In *Harkless v. Brunner,* 545 F.3d 445, 452 (6th Cir.2008), the Ohio Secretary of State was named in a lawsuit commenced by a member of ACORN claiming widespread state noncompliance with the NVRA's requirement to offer beneficiaries of federal food stamps, medicaid assistance and cash assistance programs with the opportunity to register to vote or change a voter registration address on any visits to the Department of Job and Family Services ("DJFS"). The Ohio Secretary of State—citing 42 U.S.C. § 1973gg-8—contended that the only task that Congress imposed upon her was the "coordination of State responsibilities under th[e] Act." 545 F.3d at 451. According to her:

> [B]eyond this duty to "coordinate," Congress assigned no specific tasks to the Secretary, instead choosing to allow states to determine how to allocate responsibility for the NVRA's mandates. And, because Ohio chose to implement its requirements through the county de-

partments and to make local officials responsible, those local officials, not the Secretary, are the proper parties to this lawsuit. *Id.* The Sixth Circuit disagreed, however, noting that "the entire Act, including other subsections, speaks in terms of state responsibilities; what is noticeably missing is any mention of county, municipal, or other local authorities. Indeed, Congress grafted the NVRA onto the existing public assistance structure, under which the fifty states, not their political subdivisions, have the ultimate accountability." *Id.* at 452.

With respect to the State defendants' concerns that requiring NVRA compliance by the local community colleges would be unduly financially or otherwise burdensome, Congress contemplated the financial and other burdens of state agency-based NVRA enforcement. *See ACORN v. Edgar, supra,* 56 F.3d at 796 ("Congress has passed a large number of laws altering state regulations of federal elections" which "evidently the costs of complying with ... have not imposed a significant fiscal burden on the states...."); *NCSD v. Scales, supra,* 150 F.Supp.2d at 855 ("In passing the NVRA, Congress balanced the potential financial burdens facing states against the right of eligible ... voters to meaningful participation in the federal electoral process. The considerations favoring the enfranchisement of eligible federal voters prevailed."). On the other hand, as noted in *United States v. New York,* "the burdens that would be imposed upon the Attorney General and those persons seeking enforcement of the NVRA through the private right of action conferred by Congress, such as the plaintiff ACORN, would be palpable if they had to resort to litigation against multiple local agencies in lieu of holding State VRAs fully accountable for compliance with the NVRA." 255 F.Supp.2d at 81. In any event, the Court questions the practicality of force the United States to bring suit against each and every community college in the State of New York to enforce the requirements of the NVRA when all of the colleges are all part of the "SUNY system" serving the same students and goals of higher education, particularly when the State has already voluntarily agreed to designate DSS offices on its SUNY campuses as VRAs.

## V. CONCLUSION

Based on the foregoing the Court grants plaintiffs' motion for summary judgment in finding that defendants have failed to implement the requirements of Section 7 of the NVRA, 42 U.S.C. § 1973gg–5 by refusing to designate DSS offices on its SUNY and CUNY campuses as mandatory VRAs as well as at those at DSS offices at CUNY community colleges and community colleges that are part of the SUNY system.

Wherefore, it is hereby that plaintiffs motion for summary judgment (Dkt. No. 97) is granted, and it is further

ORDERED that plaintiff is hereby directed to submit a letter and/or brief outlining what remedial phase, procedures, schedules and/or timetables will be necessary to ensure compliance with the results of this Memorandum–Decision and Order within 10 days on Notice to the State defendants. The State defendants are entitled to object to and/or oppose any such recommendations by the United States and/or offer alternative suggestions within 5 days after receiving Notice from the United States.

IT IS SO ORDERED.